Roger M. GREGORY, Jr., Appellant,

v.

UNITED STATES, Appellee.

No. 11656.

District of Columbia Court of Appeals.

Argued Dec. 13, 1977.

Decided Oct. 10, 1978.

---

Roger M. Gregory, Jr., pro se.

Jonathan Lash, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Theodore A. Shmanda, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before KELLY, GALLAGHER and FERREN, Associate Judges.

GALLAGHER, Associate Judge:

Appellant, an attorney, was convicted of soliciting a fee for legal representation from an indigent in violation of D.C.Code 1977 Supp., § 11–2606(b). He contends on appeal that (1) the trial court erred in permitting the government to introduce in an improper manner the transcript of appellant's grand jury testimony; (2) the trial court misconstrued the applicable provisions of the District of Columbia Criminal Justice

Act, D.C.Code 1977 Supp., §§ 11–2601 *et seq.* (hereinafter "the Act"), and erroneously instructed the jury on the elements of the offense; and (3) the trial court erred in denying appellant's motion for recusal.[1]

On January 26, 1975, Matthew Reeder was arrested and charged with two misdemeanor offenses. He was released on citation and told to appear in Superior Court on January 31 for arraignment. When his case was called for arraignment, Judge Bacon, who was presiding, asked Reeder if he had an attorney. Reeder replied that he did not and Judge Bacon asked appellant to speak with him. Appellant and Reeder left the courtroom and after a brief discussion concerning available diversionary programs,[2] appellant told Reeder his fee would be $150. Shortly thereafter, appellant took Reeder to the office of the administrator of the program established under the Act (hereinafter "the CJA office") whose function it is to determine whether persons charged with certain offenses[3] are "indigent" and thus eligible for appointed counsel and other services under the Act. After an interview conducted in appellant's presence, Reeder was determined to be eligible for representation under the Act and appellant was so informed.[4] A document to that effect was placed in the court jacket which appellant returned to the arraignment court.

Reeder testified that on the way back to the courtroom, after leaving the CJA office, appellant again told Reeder his fee would be $150 and that the fee must be paid before final disposition of the case. Reeder testified he was not aware that as a result of his interview with the CJA office he was entitled to have his attorney compensated

---

1. Appellant also complains that he was prejudiced by numerous evidentiary rulings made by the court throughout the trial. These rulings relate to the other issues addressed and they will be treated later in those discussions.

2. Reeder may have been eligible for "first offender treatment," a program adopted by the United States Attorney to divert from the criminal justice system persons charged with certain misdemeanor offenses.

3. D.C.Code 1977 Supp., § 11–2601.

4. Reeder was found to be "eligible without contribution," which meant he was not required to pay his appointed attorney any fee. Section 11–2606 of the Act provides a mechanism whereby the court can order a financially able defendant to pay directly to the attorney part of the cost of his defense. Appellant admitted he was familiar with this procedure, which is commonly termed a "contribution order."

by the government and did not have to pay appellant.

Reeder's case was called for arraignment and Judge Bacon asked Reeder if he wished to have appellant represent him. He replied that he did and appellant entered a plea of not guilty on his behalf. A trial date of March 27 was scheduled. Reeder testified that as they left the courtroom, appellant gave Reeder his card and told him to call at any time to discuss payment plans. Approximately one week later appellant received a $50 money order from Reeder which he endorsed and cashed.[5]

Appellant testified in his own behalf. He conceded that he quoted a $150 fee to Reeder during their initial conversation but denied mentioning any fee after Reeder had been determined eligible for representation under the Act.[6] It was appellant's defense that Reeder indicated he could afford to pay him and that Reeder had misled the CJA office as to his financial status.[7] He admitted that he did not convey to the court or Reeder his misgivings about Reeder's ineligibility under the Act, but that he intended to discuss the question with Reeder at a subsequent interview.[8] In the meantime, said appellant, he considered himself a retained rather than appointed counsel. He acknowledged that he had received a voucher form for the Reeder case from the CJA office that entitled him to payment under the Act, but asserted that he did not intend to submit the voucher and be paid both by Reeder and by the government.

The government called Judge Bacon in rebuttal.[9] She testified that when appellant and Reeder returned to the courtroom from the CJA office, she determined that Reeder was eligible for representation under the Act and that appellant would represent him in that capacity. After Judge Bacon testified, the government read to the jury the transcript of appellant's testimony before the grand jury.

## I.

During cross-examination of appellant, the prosecutor sought to impeach him by questioning him about discrepancies between his grand jury testimony and his trial testimony. Appellant explained some of the inconsistencies and denied others. At the close of evidence, the prosecutor requested that he be allowed to read in rebuttal the entire transcript of appellant's testimony before the grand jury on the ground that it constituted a "gross prior inconsistent statement." Appellant objected to its admission, claiming that it was improper rebuttal and that the transcript was "replete with incompetent evidence, testimony that could never come before a jury." The trial court ruled that the grand jury transcript could be published to the jury and that appellant could object on the grounds of relevancy and materiality to each individual question or answer as it was read. The entire transcript, subject to minor deletions, was read to the jury. Appellant requested the opportunity for surrebuttal which the court denied.

Appellant first complains that the grand jury testimony was improper rebuttal but that if allowed in rebuttal, he had a right to surrebuttal to explain any inconsistencies between his grand jury and trial statements.

5. Several weeks after appellant testified before the grand jury which later indicted him, appellant returned the $50 to Reeder.

6. Questions of credibility, of course, are for the jury to decide. *Kenion v. United States,* D.C.. App., 302 A.2d 723 (1973).

7. Appellant testified that he was surprised when Reeder told the CJA office he had three children whom he helped support. He said he understood Reeder to be single, although he admitted he never asked Reeder if he had any

dependents. At the time Reeder was arraigned he was earning a weekly salary of approximately $50–$75.

8. Appellant did not see Reeder again until the day set for Reeder's trial; by this time appellant had withdrawn and Reeder was represented by another attorney.

9. Appellant contends it was error to call Judge Bacon in rebuttal. We find no merit to his claim.

■ We begin with the general rule that the testimony of a witness before the grand jury who is later indicted may be admitted at his trial for some purposes. *United States v. Washington,* 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977); *Stanley v. United States,* 245 F.2d 427, 435 (6th Cir. 1957). Statements inconsistent with the accused's position at trial can be introduced as substantive evidence, *i. e.,* "admissions" or they can be used to impeach the accused if he testifies. *United States v. Porter,* 544 F.2d 936 (8th Cir. 1976).

■ Appellant concedes his prior statements were admissible but contends it was error to permit the government to "hold back" and save the critical grand jury testimony for rebuttal. The order of proof, however, is subject to the broad discretion of the trial court. *United States v. Trapnell,* 495 F.2d 22 (2d Cir.), *cert. denied,* 419 U.S. 851, 95 S.Ct. 93, 42 L.Ed.2d 82 (1974); *United States v. Plata,* 361 F.2d 958 (7th Cir.), *cert. denied,* 385 U.S. 841, 87 S.Ct. 94, 17 L.Ed.2d 74 (1966). We do not see that this discretion was abused. Until appellant introduced his evidence, the prosecutor could not know with certainty the extent to which appellant's grand jury testimony would conflict with his testimony at trial. The purpose of rebuttal is "to explain, repel, counteract or disprove the evidence" of the accused. *United States v. Chrzanowski,* 502 F.2d 573, 576 (3d Cir. 1974). We conclude it was not error for the prosecutor to introduce in rebuttal inconsistent pretrial statements of the appellant in order that the jury might evaluate his testimony. *United States v. Porter, supra; Dillon v. United States,* 391 F.2d 433 (10th Cir.), *cert. denied,* 393 U.S. 889, 89 S.Ct. 208, 21 L.Ed.2d 168 (1968).

■ Appellant asserts that even if this was proper rebuttal, he should have been allowed to resume his testimony and explain any inconsistencies. It is only where new matters are introduced in rebuttal, however, that the witness has a *right* to surrebuttal. *United States v. Sadler,* 488 F.2d 434 (5th Cir.), *cert. denied,* 417 U.S. 931, 94 S.Ct. 2642, 41 L.Ed.2d 234 (1974);

*Turner v. United States,* 441 F.2d 736 (5th Cir. 1971); 6 J. Wigmore, Evidence § 1874 (Chadbourne rev. 1976). In all other cases, surrebuttal is within the sound discretion of the judge. *Merrill v. United States,* 338 F.2d 763 (5th Cir. 1964). After having reviewed the grand jury testimony, we conclude there were no material issues injected for the first time in rebuttal. Appellant was aware of his grand jury testimony and had an opportunity to explain any inconsistencies on cross-examination and again on re-direct examination. In the event appellant had been allowed to take the stand again he would have been able to reiterate only what he had testified to previously. We perceive no abuse of discretion in refusing surrebuttal.

■ We do recognize a fundamental error which occurred in the admission of appellant's grand jury testimony, however. Appellant points out to this court several instances where inflammatory statements made by grand jurors in the course of their investigation were read to the jury. On appeal, he contends he should have been allowed to respond to these matters in surrebuttal. We think, however, that certain grand jurors' statements should not have been read to the trial jury in the first instance. Appellant's trial counsel objected to specific portions of the transcript being read to the jury as well as to the court's refusal to allow appellant to testify again in surrebuttal. Consequently, we prefer to treat the two issues separately.

As the grand jury testimony was being read to the jury, counsel for appellant stated it was his intention to object to all questions by grand jurors because of the undue influence they would have on the trial jury. The court ruled that as long as a grand juror's question was an integral part of the defendant's statement, "no matter how long or how far-ranging or anything like that, as long as it touches and relates to the general subject matter of the inquiry, there can be no objection to such a question." The court did rule that if a grand juror made only a "statement," it could be deleted as objectionable. Some of the

"questions" by grand jurors which were read to the jury, over specific objection, are as follows:

A JUROR: You were taking $150 out of his pocket that you [*sic*] can't afford to pay.

THE WITNESS: He told me that he could afford to pay it.

A JUROR: But on black and white, as far as his income and stuff as put down in the office, they said that he couldn't afford to pay anything. That's why they had it set up.

\*　　\*　　\*　　\*　　\*　　\*

A JUROR: . . . I still don't think it's your job to determine anyone's income. Your job should be to take everyone to the CJA office. I don't think it's your job to be interviewing people about their income. This is the reason that office was set up. It is not for you to decide. Let someone else decide. I don't think that's your job.

. . . You don't know if it's $20,000 or $10,000, or $5,000. He may be on welfare. I don't think that's your job to determine that to get your fee. It should come from another office.

THE WITNESS: Can I respond to this?

[Prosecutor]: I don't think it's really a question.

Appellant was allowed later to respond to the grand juror's statement, but the trial court's ruling that this statement could be read to the jury was patently erroneous. Other statements read over objection reflected grand jurors' personal encounters with attorneys or their opinions as to what appellant should have done vis-a-vis Reeder. For example:

A JUROR: I've had cases where I've been on the paying end of a criminal case and I had to pay a lawyer. He made it very clear to me how much I had to pay and when. There was no doubt about it. Don't you do the same thing?

*Finally,* there were even accusations of other wrongdoing by appellant read to the jury.

A JUROR: You might be receiving payments from other people that are all CJA cases and you just don't remember, but you are taking money from them and probably getting paid from the Court too.

■ We recognize that some questions propounded to appellant by members of the grand jury were necessarily admitted because they were material to the interpretation of appellant's statements. Admissions often cannot be understood in context without introduction of the accompanying remarks of another person. To that extent, statements by a person absent at trial are not hearsay, but constitute an "inseparable guide" to the meaning of an accused's admission. *United States v. Lemonakis,* 158 U.S.App.D.C. 162, 485 F.2d 941 (1973), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974). But simply because some of the grand jurors' communications were "questions" for appellant rather than "statements" did not ensure their admissibility. When objections were raised concerning the prejudicial effect of the grand jurors' side of the conversation, it became the duty of the trial court to balance the probative value of the statements introduced with their prejudicial effect on the jury. *Id.*

■ We find the statements by the grand jurors, recited above, to be highly prejudicial and can discern no supportable theory for their admission. A grand jury is an investigative body whose purpose it is to determine whether there are reasonable grounds to believe that a crime has been committed. Innocence or guilt must be determined at the trial. We cannot minimize the effect that prejudicial accusations and allegations of other wrongdoing made by members of another jury may have had on the trial jury. The evidence against appellant was not overwhelming. The dangers of impermissible use of this evidence far outweighed any value the government may have derived from it.

■ Its effect was further aggravated by the fact that the jury was allowed to take the grand jury testimony into the jury room. To compound the prejudice, the jury

was encouraged by the prosecutor in closing argument to read the grand jury transcript during deliberations. In refusing to delete the prejudicial remarks of the grand jurors, the trial judge committed reversible error. We will therefore vacate the conviction and remand for a new trial. Should the government choose to reintroduce the grand jury testimony at appellant's retrial, the transcript should be carefully limited so as to exclude all inflammatory and prejudicial statements by members of the grand jury.

Because appellant has assigned error to other matters that may well be involved in retrial of this case, it may be beneficial to discuss them at this time.

## II.

Appellant contends the trial court improperly instructed the jury on the elements of the offense due to its erroneous interpretation of the Act. Appellant was convicted of violating D.C.Code 1977 Supp., § 11–2606(b) which provides:

Any person compensated, or entitled to be compensated, for any services rendered under this chapter who shall seek, ask, demand, receive, or offer to receive, any money, goods, or services in return therefor from or on behalf of a defendant or respondent shall be fined not more than $1,000 or imprisoned not more than one year, or both.

The court instructed the jury that it could find appellant guilty if

. . . the defendant knowingly received or knew that he was entitled to receive, only from Criminal Justice Act funds, legal fees for the legal representation of Mr. Matthew Reeder . . . .
The defendant knowingly solicited, asked, requested, or demanded of Mr. Matthew Reeder, legal fees for the legal representation of Mr. Matthew Reeder . . . .
The defendant had the specific intent to solicit, ask, request or demand of Mr. Matthew Reeder a legal fee after the defendant knew that he was entitled to receive legal fees only from the Criminal Justice Act funds . . . .

\*    \*    \*    \*    \*    \*

. . . the phrase . . . knew that he was entitled to receive legal fees only from the Criminal Justice Act funds . . . means that the defendant knew either that the Criminal Justice Act office had determined or recommended that Mr. Matthew Reeder was eligible to receive counsel under the Criminal Justice Act without payment of any fees by him or that the Court had made that determination. It is not necessary . . . that a formal determination to this effect have been made by the Court or that the Court have entered a formal order of appointment of Mr. Gregory as Mr. Reeder's counsel.

Appellant attacks that portion of the jury instructions defining a person "entitled to receive legal fees" under the Act. He claims he was not entitled to compensation under the Act because (1) the *court* never made a formal finding that Reeder was eligible for legal representation under the Act, and (2) the court never entered a formal order of appointment of appellant as counsel to Reeder.

■ Appellant concedes that the CJA office made a determination that Reeder was eligible for representation under the Act. He contends, however, that § 11–2602 of the Act requires the *court*, not the administrative offices, to make the final determination of eligibility. This section provides that "the court, if satisfied after appropriate inquiry that the defendant . . . is financially unable to obtain counsel, shall appoint counsel to represent him." The transcript of the proceedings in arraignment court indicates that the court made no independent inquiry of financial eligibility of Reeder but relied instead on the CJA office to make that finding. Absent an "appropriate inquiry" by the court, appellant argues, Reeder was not eligible for appointed counsel. Both the legislative history of the Act and the plan drawn up by the local courts to implement the Act reflect, however, that the CJA office is authorized to make the eligibility determination, subject to review or redetermination of eli-

gibility by the court if it appears the financial circumstances of the defendant change.

During debate in the House on the proposed Act, the following exchange ensued:

> MR. GROSS: But what is the real definition [of an indigent]? Does it mean they have absolutely no money? What is the test of an "indigent" in this case?
>
> MR. FAUNTROY: Mr. Speaker, under the procedure set up by the courts, that determination is made by the coordinator of the criminal justice administration in the city.
>
> MR. GROSS: By whom?
>
> MR. FAUNTROY: By the coordinator of the local CJA program.
>
> MR. GROSS: What is the "CJA program"?
>
> MR. FAUNTROY: CJA. The Criminal Justice Act program.
>
> MR. GROSS: So someone in that program determines who is an indigent; who does not have money or who does have money; who can pay or who cannot pay for legal services; is that correct?
>
> MR. FAUNTROY: The gentleman is correct. [120 Cong.Rec. 22333 (1974).]

■ The *Plan for Furnishing Representation to Indigents under the District of Columbia Criminal Justice Act,* effective November 29, 1974, which was promulgated by the Joint Committee on Judicial Administration, authorizes persons other than a judge to determine eligibility. Title III of that plan provides:

> In all cases, it shall be the duty of the judge *or hearing examiner* to determine whether a person is financially unable to obtain adequate representation. [Emphasis added.]

Thus, it is evident that the Act allows either the court or its authorized representative to make findings of eligibility. If appellant were correct, the judge presiding in arraignment court would be personally required to interview all persons charged regardless of the finding by the very office authorized by the courts to make that determination.[10]

■ Appellant's second argument—that he was not "entitled to compensation" until the court signed a formal order of appointment—is likewise without merit. After Reeder had been found eligible by the CJA office, a document to that effect was inserted in the court jacket and given to the court by appellant when he and Reeder returned to the courtroom. When the case was called for arraignment the following exchange occurred:

> THE COURT: . . . Mr. Reeder, have you talked with Mr. Gregory?
>
> MR. REEDER: Yes, ma'am.
>
> THE COURT: Do you want him to assist you in this matter?
>
> MR. REEDER: Yes, I do. .
>
> THE COURT: Mr. Gregory, what is your representation?
>
> MR. GREGORY: Your Honor, at this time, we want to enter a plea of not guilty, make a jury demand, request a trial date . . . .

Judge Bacon testified that she received the form reflecting Reeder's eligibility for representation under the Act and concluded that appellant would represent him in that capacity. Although Judge Bacon did not enter a formal oral or written order of

---

**10.** Appellant concedes that he did not bring to the court's attention his alleged misgivings about Reeder's eligibility under the Act. He defends his silence by claiming that to reveal any discrepancies between Reeder's factual representations to appellant and the CJA office would have violated the "code of ethics" governing the attorney-client relationship. We note, however, that the plan implementing the Act specifically provides for this situation. Section D of Title III provides:

> If at any time after his appointment, counsel has reason to believe that a person is financially able to pay counsel or to make partial payment for counsel, he *shall* advise the court which appointed him that there is a question concerning the person's right to appointed counsel. The court . . . shall not require the appointed attorney to disclose confidential information concerning his client's financial status if the attorney states that such information might be incriminating to the person. [Emphasis added.]

appointment [11] at the time of Reeder's arraignment, we conclude that when appellant undertook to represent Reeder at his arraignment, no further steps were necessary for appellant to be considered a person entitled to compensation under the Act. Appellant knew that the CJA office had found Reeder eligible, that a document reflecting this determination was before the court, and that he would be compensated under the Act for his services if he submitted a voucher when the case was completed. He concedes that, in fact, he did receive a voucher form for the Reeder case prepared by the CJA office for an attorney who has been appointed under the Act.[12] We do not think formal appointment is the determining factor in entitling a person to compensation. The Act clearly contemplates that appointment procedures are to be flexible. For example, § 11–2602 provides that "appointment may be made retroactive to include any *representation furnished pursuant to the plan prior to appointment.*" (Emphasis added.) We conclude that the jury could have found appellant "entitled to receive compensation" under the Act and that the court did not err in its instructions to that effect.

Finally, appellant contends that Congress intended to prevent only *additional* payments under the Act and that the court erred in not instructing the jury to find that appellant must have sought compensation both under the Act and from an indigent.[13] In support of his argument he cites from the Congressional Conference

Report, H.R.Rep.No.93–1295, 93d Cong., 2d Sess., at 8:

> . . . [T]he Senate Bill contained an additional provision providing for a fine of not more than $1000 or imprisonment for not more than one year or both for individuals who seek or receive in any manner any *additional payments.* [Emphasis added.]

The District of Columbia Criminal Justice Act, like its federal counterpart,[14] was designed to ensure that indigent defendants would receive adequate counsel. *See* H.R. Rep.No.93–1172, 93d Cong., 2d Sess. 1 (1974). We think Congress did intend to prevent double payments to attorneys appointed under the Act. But Congress sought also to make it illegal for a court-appointed attorney to request or accept a fee from his indigent client. Matthew Reeder did not seek to have appellant represent him. Appellant made himself available and was asked, as an officer of the court, to speak to a person who did not have the resources to employ his own counsel before he arrived in court for arraignment.[15]

The litigant with means can choose his counsel. The pauper cannot, and his constitutional right to appointed counsel has not been extended to the point of affording him this privilege. That it has not been should be no basis for exposing him to the necessity of trying by some means to gather together funds to compensate the attorney whom he has not selected . . . . [*United States v. Senak,* 477

---

11. Judge Bacon did testify that she considered appellant to be at least implicitly "appointed" at this time.

12. Appellant notes that this form was signed by Mr. Hughes, an employee of the CJA office, and contends that in January 1975, Hughes had no authority to sign appointments of counsel. Judge Bacon testified, however, that she had authorized Hughes to make appointments at her direction. Second, the former director of the CJA office, James Brown, testified that even if Hughes was not authorized in writing in January 1975 to sign vouchers, an attorney submitting the form with Hughes' signature on it was entitled to compensation.

13. Appellant never submitted a voucher. By the time of Reeder's trial, investigation of the present charges had commenced and a new attorney had been appointed to represent Reeder.

14. 18 U.S.C. § 3006A (1969). The federal act has no similar provision attaching criminal liability to one who seeks funds from an indigent.

15. Appellant admitted that the $150 fee quoted to Reeder was higher than the fee he would have received for the same services under the Act. If he had submitted a voucher, his fee under the Act would have been between $65–$100.

F.2d 304, 308 (7th Cir.), *cert. denied,* 414 U.S. 856, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973).]

The trial court did not err in refusing to instruct the jury that appellant must have sought dual compensation.[16]

### III.

Prior to trial, appellant filed an affidavit of prejudice in support of his motion for recusal of the trial judge. The affidavit alleged that (1) appellant had sought a writ of mandamus against the trial judge approximately four years prior to the commencement of this action; (2) the trial judge had cited appellant for contempt in another judicial proceeding;[17] (3) the trial judge and appellant were opposing litigants in a suit filed by several attorneys against all Superior Court judges for reducing the monetary claims of the attorneys in vouchers filed pursuant to the Act; (4) the trial judge had participated in drafting the plan for implementation of the Act; and (5) the trial judge exhibited personal hostility toward appellant in pretrial proceedings. In a written order issued June 3, 1976, the trial judge found appellant's allegations did not amount to the kind of personal prejudice required by Super.Ct.Civ.R. 63–I to mandate his recusal. Rule 63–I provides in pertinent part:

> (a) Whenever a party to any proceeding makes and files a sufficient affidavit that the judge before whom the matter is to be heard has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

Rule 63–1 is substantially identical to 28 U.S.C. § 144. We therefore look to decisions of the federal courts interpreting this section as well as to opinions of this court for guidance in determining the legal sufficiency of appellant's motion for recusal.

When presented with an affidavit of prejudice, the trial judge must accept the allegations made therein as true in passing on their legal sufficiency. *Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921). The bias or prejudice must be personal in nature and have its source "beyond the four corners of the courtroom." *Tynan v. United States,* 126 U.S.App.D.C. 206, 210, 376 F.2d 761, 765, *cert. denied,* 389 U.S. 845, 88 S.Ct. 95, 19 L.Ed.2d 111 (1967). An allegation of "judicial" bias is not a sufficient ground for recusal. *United States v. Falcone,* 505 F.2d 478 (3d Cir. 1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975). The bias or prejudice must have its basis in other than what the judge learned from his participation in either the pending case or prior case. *United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Baylor v. United States,* D.C.App., 360 A.2d 42, *cert. denied,* 420 U.S. 1024, 97 S.Ct. 643, 50 L.Ed.2d 626 (1976). When evaluated in light of these principles, we are convinced the trial judge's refusal to recuse himself was not error.

Appellant's allegation that he was prejudiced by having to appear before the same judge against whom he had sought a writ of mandamus, and who had

---

**16.** It is apparent from our reading of this record that not all judges presiding in arraignment court require that an accused who has been released on citation or bond be interviewed by either the CJA office or the court to determine eligibility for representation under the Act. (Persons who come to the court in custody are automatically interviewed.) We find the Act and its implementation plan to be mandatory in application: In all criminal cases specified under § 11–2601, an accused who appears in court without counsel *shall* be informed that he has the right to be represented by appointed counsel if he is financially unable to obtain counsel. It is, therefore, the duty of the court

or the CJA office to determine whether a person appearing without counsel is eligible for representation under the Act.

**17.** *United States v. Ray,* D.C.Super.Ct. (Cr. No. 88318–75). The order of contempt was affirmed by this court. *In re Gregory,* D.C.App., 387 A.2d 720 (1978). Appellant suggests that the contempt citation was "in connection" with the instant case. We fail to perceive any legal connection. Appellant was cited for contempt because he appeared several hours late for trial in the *Ray* case; his excuse was that he was working on matters pertaining to the defense of the instant case.

held him in contempt in a prior proceeding is not legally sufficient to justify recusal. An affidavit is insufficient if based on prior adverse judicial rulings. *Barkan v. United States,* 362 F.2d 158 (7th Cir.), *cert. denied,* 385 U.S. 882, 87 S.Ct. 170, 17 L.Ed.2d 109 (1966). "Merely because a trial judge is familiar with a party and his legal difficulties through prior judicial hearings, or has found it necessary to cite a party for contempt, does not automatically or inferentially raise the issue of bias." *Barry v. Sigler,* 373 F.2d 835, 836 (8th Cir. 1967); *see also United States v. Weldon,* 384 F.2d 772 (2d Cir. 1967) (no personal prejudice found where court issued warrant for failure to appear and later sat as trier of fact).

■ Appellant's contention that he was prejudiced because the judge brought to the trial preconceived notions and interpretations of the Act by virtue of his participation in the implementation plan also must be rejected. Mere allegations based on a judge's background are insufficient to suggest partiality toward the parties before him. *Eisler v. United States,* 83 U.S.App. D.C. 315, 170 F.2d 273 (1948), *cert. dismissed,* 338 U.S. 883, 70 S.Ct. 181, 94 L.Ed. 542 (1949) (in prosecution of an admitted Communist for refusing to testify before a congressional committee, trial judge previously had sponsored legislation providing for the deportation of Communists; held, insufficient to constitute prejudice in the personal sense).

■ We similarly dismiss appellant's remaining claims of prejudice. The fact that the trial judge is alleged to have reduced appellant's claims for compensation under the Act is not a ground for recusal. This action was an exercise of a judicial function—the evaluation of an attorney's services—and does not constitute bias. Finally, we note that any remarks made by the judge during pretrial proceedings arose out of rulings in connection with the case and an inference of personal bias cannot be supported. *See Woodard v. City Stores Company,* D.C.App., 334 A.2d 189 (1975); *In re Webster,* 382 F.2d 79 (9th Cir. 1967).

■ Appellant contends, however, that even if the affidavit was insufficient to support recusal, the rulings of the trial judge throughout the trial evidenced such hostility toward appellant as to deprive him of a fair trial. Having examined the record, we conclude the trial judge did not demonstrate personal bias. To the contrary, appellant was allowed a fair opportunity to present his case. Adverse rulings, without more, certainly do not establish that a judge lacked the impartiality necessary to give the accused a fair trial. *See Harris v. Wagshal,* D.C.App., 343 A.2d 283 (1975); *Woodard v. City Stores Company, supra.*

The judgment appealed from is reversed and remanded for a new trial.

*So ordered.*