Arthur L. **WILLCHER**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 13189.

District of Columbia Court of Appeals.

Argued Feb. 6, 1979.

Decided Sept. 19, 1979.

Thomas C. Green, Washington, D. C., for appellant. Arthur L. Willcher, Washington, D. C., also entered an appearance, pro se.

Regina C. McGranery, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the brief was filed and the case was argued, and John A. Terry, Michael W. Farrell and Eric B. Marcy, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and GALLAGHER and HARRIS, Associate Judges.

GALLAGHER, Associate Judge:

A jury found appellant guilty of unlawful solicitation of money from an indigent whom he had been appointed to represent under the District of Columbia Criminal Justice Act, D.C.Code 1978 Supp., §§ 11–2601 et seq.[1] Appellant seeks reversal of his conviction on three grounds: (1) the unconstitutionality of the applicable penal provisions of the Act;[2] (2) improper cross-examination of appellant, by means of his testimony before a grand jury regarding a prior solicitation incident; and (3) the erroneous inclusion of statutory background on the Criminal Justice Act in the trial court's final charge to the jury. We affirm.

## I.

### A. The Government's Evidence

On October 17, 1976, Ferdinand Diaz was stopped by the police for driving a motorcycle without a tail light. When a police check revealed the motorcycle was stolen, Diaz was arrested for unauthorized use of a vehicle, receipt of stolen property and possession of implements of a crime.

The following day, appellant visited Diaz in the lockup, and introduced himself as a court-appointed attorney. During a brief conversation, appellant advised Diaz of the felony charges against him, the consequences of a felony conviction, and the possibility of reducing the charge to a misdemeanor. Diaz recalled appellant's making general inquiries about his background and family, and then asking whether the family would be willing to send money to get him out of jail.

Q: There came a point that you told Mr. Willcher that your father was in the military and that he owns property?

A: Yes, sir.

Q: What did Mr. Willcher say to you after that?

A: He said if they care enough to get me out, to send me some money to get me out.

Q: What did you say in response to that?

A: I said, yes, I'm sure that they are concerned enough and that they'll, you know, they'll pay whatever it is if it's legitimate, and if I could have a chance to talk to them they would send money, yes.

Diaz testified further that the sum of $500 was mentioned by appellant. Although he understood appellant to be asking for money to pay legal fees, he admitted on cross-examination that appellant never mentioned "legal fees," but only inquired whether Diaz' parents might be able to raise $500. At the presentment later that day, Judge Sorrell entered a formal order appointing appellant to represent Diaz[3] and set a $2,000 surety bond.

---

1. D.C.Code 1978 Supp., § 11–2606(b).

2. D.C.Code 1978 Supp., § 11–2606(b) provides: Any person compensated, or entitled to be compensated, for any services rendered under this chapter who shall seek, ask, demand, receive or offer to receive, any money, goods, or services in return therefor from or on behalf of a defendant or respondent shall be fined not more than $1,000 or imprisoned not more than one year, or both.

3. According to testimony of Howard Hughes, the Superior Court Criminal Justice Program Coordinator, Diaz qualified as an indigent and was, therefore, determined eligible for court-appointed counsel under the Criminal Justice Act.

After his preliminary hearing on October 21, Diaz testified he never saw appellant again. On November 3, Diaz spoke with Helen Holland, a volunteer with the Visitors Service Center, and asked her to contact his parents in Texas and Mr. Willcher. Diaz also mentioned to Mrs. Holland that appellant had requested $500. After speaking to Mrs. Diaz, Mrs. Holland called appellant's office and left a message. When appellant returned her call, Mrs. Holland mentioned the family's concern for Ferdinand, and asked what steps had been taken to secure his release. According to Mrs. Holland, appellant asked "how concerned are they. Are they willing to pay me $1,000 to get him out of jail."

Mrs. Holland reported the $1,000 request to her supervisor and to an attorney at the Public Defender Service, who advised her to speak with the United States Attorney's Office. On November 10, 1976, Mrs. Holland placed a call to appellant from the prosecutor's office. The conversation was tape-recorded and transcribed:

W: Hello.

H: Hello, may I speak with Mr. Willcher, please?

W: Speaking.

H: Mr. Willcher this is Helen Holland. You remember I'm the friend of Maria Diaz, mother of Fernando.

W: Yes.

H: Yes, we talked last week.

W: Yes.

H: And then I contacted the family—

W: Uh-huh.

H: I talked to the mother.

W: Uh-huh.

H: And she was very excited and said yes that she would be willing to get the money and pay you your fee if you can get him out.

W: Tell you what you do, let me make a note of this.

H: Wait a minute, let me get a piece of paper. Now she also mentioned, she said she thought that perhaps he is entitled to a free lawyer—

W: He is.

H: He is?

W: Uh-huh.

H: Ah, but you're not that one?

W: Yes, I am.

H: Oh.

W: I'd be perfectly willing to defend him.

H: Uh-huh.

W: But if I got to go out of my way you know see what I can do on the side—

H: Oh—

W: Privately, hm?

H: And then you can, you think you can get him out?

W: Yes.

* * * * * *

W: Uh-huh. Mrs. Holland, if you would do this—*have her send the money to you.*

H: Yes.

W: And I'll let you know when the matter has been cleared up.

H: Alright. How soon? She is very anxious to know.

W: I know. I know. I'll get busy on it tomorrow.

H: And she is very anxious to have him out on bond. And I can receive him in my home if he can be out on bond.

W: You will take care of him in your home?

H: Oh, yes, yes.

W: Well, I might be able to get him out on bond without any cost. I might be able to save that bond premium.

H: Well, the money for the bond is deposited in his account at the jail, so ah—

W: Oh I know but it hasn't been spent yet.

H: No, it is there.

W: Well, I might be able to save it.

H: Uh-hm. So I can give her good news?

W: Yes.

H: I hope. Alright. And then I will be in touch with you?

W: Yes, you will.

H: Thank you very much.

W: Certainly.

H: Uh-huh. Good-bye. [Emphasis supplied.]

Mrs. Holland had a third conversation with appellant on November 15. At that time she informed him that the family was willing to send money. Appellant dictated a message to Mrs. Holland, to be sent by Mr. Diaz with a $1,000 check to Mrs. Holland. Mrs. Holland recorded the message in shorthand, transcribing it immediately into longhand:

> Dear Mr. Willcher: We are hereby retaining you to represent our son, Fernando Diaz, in the criminal charges that are pressed against him. You are to be paid as a private attorney, even though we know that he is entitled to free services from an attorney under the Criminal Justice Act. Signed Mr. and Mrs. Diaz. Enclosed check for $1,000.00. The address is Arthur Willcher, 1700 Pennsylvania Avenue, Northwest, Suite 187.

Mr. Diaz sent a telegram with substantially the same message to appellant's office, followed on November 18 by a letter and $1,000 check.

A new attorney was appointed to represent Diaz. Diaz later pleaded guilty to attempted unauthorized use of a motor vehicle (a misdemeanor).

### B. The Defense Evidence

Appellant testified in his defense. He did not dispute that conversations with Diaz and Mrs. Holland took place; rather his defense was that he never solicited money for his own legal services. He testified that at the initial conversation with Diaz in the cellblock, he mentioned the sum of $500 in the course of telling Diaz that a bondsman might require collateral above the usual 10% because of his lack of community ties. Appellant recalled telling Mrs. Holland on November 3 that he hoped to get Diaz' charge reduced to a misdemeanor, and to that end would have to retain someone with more power and influence to bargain with the prosecutor's office. He estimated the cost of retaining another attorney to handle the matter at $1,000. The November 10 conversation, he testified, referred to the prior discussion about hiring a "private" attorney. Appellant told Mrs. Holland, for that reason, to leave the payee on the check blank. He admitted dictating the letter to Mrs. Holland over the telephone on November 15, but emphasized that the check was to be sent to Mrs. Holland.

Appellant testified that he filed the check and the letter, destroying both after he spoke with someone at the prosecutor's office concerning a breakdown of the charge. It was appellant's testimony that another attorney, Harvey Black, had put him in touch with the Assistant United States Attorney.

Mr. Black testified that appellant had discussed the Diaz case with him, and asked for a suggestion as to who might be retained for negotiation with the United States Attorney's office.

## II.

Initially appellant launches a constitutional attack on D.C.Code 1978 Supp., § 11–2606(b), on the grounds of vagueness and overbreadth. He contends, as he did before the trial court, that the ambiguities inherent in the statutory language "entitled to be compensated" and "services rendered," and the imprecise description of prohibited activity, required dismissal of the information.

To survive a vagueness challenge, a statute must satisfy the due process requirements of adequate notice and non-discretionary standards. *See, e. g., Parker v. Levy,* 417 U.S. 733, 752, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), quoted in *District of Columbia v. B.J.R.,* D.C.App., 332 A.2d 58, 60, *cert. denied,* 421 U.S. 1016, 95 S.Ct. 2425, 44 L.Ed.2d 685 (1975). The evil of a vague statute is that it fails to provide clear notice of the conduct forbidden, and invests the police with excessive discretion to decide who has violated the law. *District of Columbia v. Walters,* D.C.App., 319 A.2d 332, 335, 337, *cert. denied,* 419 U.S. 1065, 95 S.Ct. 650, 42 L.Ed.2d 661 (1974).

Our task is to determine, therefore, whether the statutory section is "sufficient-

ly explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties," or whether it is so vague that "men of common intelligence must necessarily guess at its meaning." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). *See also District of Columbia v. Gueory*, D.C.App., 376 A.2d 834, 839 (1977); *Moore v. United States*, D.C.App., 306 A.2d 278, 281 (1973). We do not make this determination in a vacuum, however, for

> [t]he Supreme Court has reminded us that "vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 . . . (1975). Only a statute that proscribes "no comprehensible course of conduct at all . . . may not constitutionally be applied to any set of facts." *United States v. Powell*, 423 U.S. 87, 92, 96 S.Ct. 316, 320–321, 46 L.Ed.2d 228 . . . (1975). [*In re A.B., Jr.*, D.C.App., 395 A.2d 59, 61 (1978).]

■ Appellant had sufficient notice that he was a person "entitled to compensation" under the Act, and, therefore, subject to the proscriptions of § 11–2606(b). This court recently had occasion to define the phrase "entitled to compensation" as used in § 11–2606(b). *See Gregory v. United States*, D.C.App., 393 A.2d 132 (1978). Although the constitutionality of § 11–2606(b) was not directly challenged in *Gregory*, our construction of the statute supplies sufficient definiteness to overcome appellant's vagueness objection. *See, e. g., Lakin v. United States*, D.C.App., 363 A.2d 990, 996 (1976).

■ In *Gregory* the attorney had been convicted of soliciting a fee from an indigent for legal representation and argued that the trial court improperly instructed the jury on the elements of the offense, specifically that portion of the instructions defining a person entitled to compensation. When the attorney undertook representation of his indigent client at arraignment,

knowing the client had been found eligible for public assistance, we concluded that no further steps were necessary for entitlement to compensation. *Id.* 393 A.2d at 141. Thus, appellant's argument that an attorney is not entitled to compensation until a payment voucher is filed and approved is without merit. Besides representing Diaz at his arraignment, appellant, unlike the attorney in *Gregory*, received a formal order of appointment under the Act.

■ We also find without merit appellant's contention that the phrase "services rendered" is legally imprecise, because it fails to distinguish between past and future services. Appellant argues that an attorney would not be entitled to compensation for services to be rendered. As defined in *Gregory*, however, entitlement to compensation commences when the lawyer undertakes representation of an eligible client, not after he discharges his legal duties.

■ Appellant also contends that § 11–2606(b) fails to define with sufficient specificity the type of attorney-client contact proscribed. To support his contention, appellant suggests various conversations which might be inhibited by the statute, including solicitation of expert's fees or discussions about securing bond collateral. A statute will not be struck down as vague, however, even though marginal cases could be conjured where doubts might arise. *See District of Columbia v. B.J.R., supra* 332 A.2d at 61, citing *United States v. Harriss*, 347 U.S. 612, 618, 74 S.Ct. 808, 98 L.Ed. 989 (1954). "The constitutional deficiency of a vague statute, in contrast to that of an overbroad one, is that it fails adequately to describe what conduct is prohibited and not necessarily that it prohibits constitutionally protected behavior." *District of Columbia v. Walters, supra* 319 A.2d at 337 n.10.

■ The terms of § 11–2606(b) put a reasonable person on notice that certain conduct is deemed criminal, *viz.*, the solicitation or acceptance of a fee by a court-appointed attorney from his indigent client. Furthermore, where as here, appellant's conduct falls "squarely within the 'hard

core' of the statute's proscriptions," it is irrelevant that the statute's outermost boundaries may be imprecise. *Broadrick v. Oklahoma*, 413 U.S. 601, 608, 93 S.Ct. 2908, 2914, 37 L.Ed.2d 830 (1973).[4] A potentially overbroad statute may be upheld as applied without considering whether conduct not before the court has been impermissibly burdened. *See, e. g., Harris v. United States*, D.C.App., 315 A.2d 569 (1974).

Since appellant cannot successfully attack § 11–2606(b) as applied to his conduct, he attempts to bring this case within the rules governing First Amendment rights. Appellant seeks to characterize this statute as one capable of reaching expression protected by the First Amendment, and, thus (1) demanding a greater degree of specificity, *see, e. g., Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974), and (2) subject to challenge as overbroad, even by one to whom it may constitutionally be applied. *See, e. g., Broadrick v. Oklahoma, supra* 413 U.S. at 612–13, 93 S.Ct. 2908. Any effect of § 11–2606(b) on First Amendment rights is, at most, incidental.[5] As the Supreme Court recently stated,

> "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated,

4. We find without merit appellant's claim of insufficient evidence based on his argument that only "hard-core solicitation" can constitutionally be forbidden under § 11–2606(b), which appellant defines as a conversation in which the court-appointed lawyer directly asks the indigent client for money to pay for his legal services. The statute can be constitutionally construed to encompass the conduct attributed to appellant.

5. Even in the First Amendment area, the facial overbreadth doctrine does not apply when a limiting construction has been or could be placed on the challenged statute. *See Broadrick, supra* 413 U.S. at 613, 93 S.Ct. 2908.

6. *E. g.*, "the exchange of information about securities, *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968), *cert. denied*, 394 U.S. 976 [, 89 S.Ct. 1454, 22 L.Ed.2d 756] (1969), corporate proxy statements, *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 [, 90 S.Ct. 616, 24 L.Ed.2d 593] (1970), the exchange of price and production information among competitors,

evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S.Ct. 684, 691, 93 L.Ed. 834 (1949). Numerous examples could be cited of communications that are regulated without offending the First Amendment . . . . [*Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978).][6]

### III.

Appellant also contends the trial court committed error by permitting cross-examination of appellant, over objection, concerning a prior uncharged fee solicitation incident. After a proffer by the government and a bench conference, the court allowed the prosecution to elicit the following:[7]

Q: Mr. Willcher, in 1975, I believe, did you represent an indigent defendant named Margy Armstrong?

A: Yes, I did.

Q: And were you appointed to represent her under the Criminal Justice Act?

A: Yes, I was.

Q: And after being appointed under that Act and while you were representing her, did you not ask, demand, solicit and receive a fee from her?

*American Column & Lumber Co. v. United States*, 257 U.S. 377 [, 42 S.Ct. 114, 66 L.Ed. 284] (1921), and employers' threats of retaliation for the labor activities of employees, *NLRB v. Gissell Packing Co.*, 395 U.S. 575, 618 [, 89 S.Ct. 1918, 23 L.Ed.2d 547] (1969). . . . Each of these examples illustrates that the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." 436 U.S. at 456, 98 S.Ct. at 1919. In *Ohralik*, the Court found a lawyer's procurement of remunerative employment "marginally affected with First Amendment concerns" and subject to regulation in furtherance of the state's interest in "preventing those aspects of solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of 'vexatious conduct.' " *Id.* at 459, 462, 98 S.Ct. at 1920, 1922.

7. The court deemed the proffered evidence admissible to show intent.

A: Yes, I did.

\* \* \* \* \* \*

Q: Mr. Willcher, did you not testify in an unrelated proceeding on September 30th, 1975, and I'm quoting from your testimony: I won't ask any more people for any more money in connection with CJA in any particular case?

A: Yes, I did. I never have.

The trial judge immediately instructed the jury that the testimony was admitted solely for the limited purpose of showing intent to commit the charged offense. A similar instruction was given in the court's final charge to the jury.

 As appellant correctly points out in his brief, evidence of criminal acts other than the charged offense is inadmissible where it tends to prove a criminal disposition, because of the risk that the jurors may infer guilt in the case before them. *See, e. g., Miles v. United States*, D.C.App., 374 A.2d 278, 282–83 (1977); *Wooten v. United States*, D.C.App., 285 A.2d 308, 309 (1971), quoting *Drew v. United States*, 118 U.S.App.D.C. 11, 15, 331 F.2d 85, 89 (1964). As this court has stated:

> It is fundamental to a system of criminal justice based upon a presumption of innocence that the process of adjudication must be insulated from the unrelated character traits and past conduct of the accused. It is the rule that unless the circumstances fit within one of several recognized exceptions [8] testimony regarding uncharged offenses is inadmissible. *See Wooten v. United States*, [*supra*]. [*Harris v. United States*, D.C.App., 366 A.2d 461, 463 (1976) footnote omitted).]

Thus, unless the evidence of prior "bad acts" is introduced for a legitimate purpose, its probative value is presumed to be outweighed by the prejudicial effect. *See,*

*Drew, supra* 118 U.S.App.D.C. at 16, 331 F.2d at 90. Even though relevant evidence of an uncharged offense falls within an exception, however, it may still be excluded by the trial judge when the degree of prejudice exceeds the probative value. *See, e. g., Light v. United States*, D.C.App., 360 A.2d 479 at 480 (1976); *Harris v. United States, supra* 366 A.2d at 464. This weighing process is within the discretion of the trial judge. *Wooten v. United States, supra* 285 A.2d at 309.

Appellant contends that the trial court erred in assessing the "probative value" of the evidence. He asserts that the only possible relevance of the prior testimony was to convince the jury that appellant was predisposed to violate the statute. Further, appellant imputes a duty on the part of the trial judge, before balancing prejudice and probativeness, to inquire into the details of the prior incident and determine whether the prior offense is actually probative of intent (*i. e.,* so related in time and circumstances to the offense charged as to shed light on intent). *See, e. g., Boyer v. United States*, 76 U.S.App.D.C. 397, 398, 132 F.2d 12, 13 (1942).

 To assess the probativeness and relevance of a prior incident, two threshold determinations must be made: (1) was an issue raised on which other crimes evidence could be received; and (2) was the proffered evidence relevant to that issue. Whether an issue has been raised for purposes of receiving other crimes evidence depends upon both the elements of the offense charged and the defense presented. *United States v. Clemons*, 503 F.2d 486, 489 (8th Cir. 1974). *See also Rink v. United States*, D.C.App., 388 A.2d 52, 55 (1978).

---

8. *E. g.,* where the evidence is relevant to (1) motive, (2) intent, (3) absence of mistake or accident, (4) common scheme or plan, or (5) identity. *See, e. g., Drew, supra* 118 U.S.App. D.C. at 16, 331 F.2d at 90; McCormick's Handbook of the Law of Evidence § 190 (2d ed. 1972). District of Columbia practice is generally consistent with Fed.R.Evid. 404(b) which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Of course, "[t]here is no talismanic effect to the words 'intent' or 'design,' and prior offenses must be carefully analyzed beyond the mere assertion of these code words before the offenses are admitted into evidence." *United States v. San Martin*, 505 F.2d 918, 923 (5th Cir. 1974). As several courts have recognized, the intent exception has a capacity to emasculate the other crimes rule, since intent is generally an element of the offense charged. *See, e. g., United States v. Miller*, 508 F.2d 444, 450 (7th Cir. 1974); *United States v. Clemons, supra* at 489; Wright & Graham, Federal Practice and Procedure: Evidence § 5242 at 488–89 (1978). Thus, it has been stated that intent must be a material or genuine issue in the case, not merely a formal issue in the sense of entitlement to an instruction. *See, e. g., United States v. Fierson*, 419 F.2d 1020, 1023 (7th Cir. 1969); *United States v. Clemons, supra* at 489.

We find that knowledge[9] and intent were properly at issue in this case. Appellant sharpened the intent issue by testifying that he committed the act without the requisite mental state (*i. e.,* that he solicited money for another, not for himself). Consequently, a critical question for the jury was the state of appellant's mind at the time of the solicitation. *See United States v. Gay*, 133 U.S.App.D.C. 337, 340, 410 F.2d 1036, 1039 (1969). The government properly waited until cross-examination to elicit the prior crimes evidence. Appellant opened the door through his defense, thereby increasing the need for the evidence.

To be probative of intent, however, the prior criminal conduct usually must involve an offense similar in kind and reasonably close in time to the charge at trial. *See, e. g., Boyer, supra* 76 U.S.App. D.C. at 398, 132 F.2d at 13; *United States v. Clemons, supra* at 489.[10] The degree of similarity required turns on the circumstances of the case and the theory on which the other crime is relevant to prove intent. Similarity is crucial where the evidence is offered to prove intent on the "theory of probabilities." *See* Wright & Graham, *supra,* § 5242 at 488, 491; *United States v. Beechum*, 555 F.2d 487, 495 (5th Cir. 1977).[11] Here, appellant admitted before a grand jury that he violated the Act by asking for and receiving a fee from an indigent client he was appointed to represent. We cannot say the solicitation incident which occurred

---

**9.** The prior incident bears on appellant's knowledge of his client's entitlement to free counsel. Such knowledge is an element of the offense charged, and a prerequisite of entitlement to compensation, as defined in *Gregory.* That knowledge was also revealed by appellant in his tape-recorded conversation with Mrs. Holland. The availability of other means of proof, and the government's need for the evidence may affect the probative value of the evidence, but does not require automatic exclusion. *See* Fed.R.Evid. 404(b), Advisory Committee's Note.

**10.** It has been stated:

The very nature of the inductive leap from past act to present intent renders critical the degree of similarity between the prior and the charged offenses. Congruence between the essential physical elements of the prior and charged crimes is essential to the validity of the logical inference. . . . The inherent uncertainty in the inference, however, as well as the grave risks of prejudice occasioned by evidence of extrinsic offenses makes imperative that the prosecutor first prove convincingly that the prior offense is a suitable point of departure for the logical leap to the present. [*United States v. Beechum*, 555 F.2d 487, 495 (5th Cir. 1977).]

**11.** In affirming the admission into evidence of 13 bad checks which a defendant represented as good, in a prosecution for obtaining money under false pretenses, the United States Court of Appeals for the District of Columbia Circuit stated:

"Knowledge of the falsity of the other representations need not be shown. * * * It is the mere recurrence of similar incorrect (not necessarily knowingly false) representations which leads to the belief that they could not have been made innocently; *we may assume that any given one might have been innocent, but cannot concede this when we notice the recurrence.*" 2 Wigmore on Evidence, 3d ed., § 321(2)(c). [*Green v. United States*, 88 U.S. App.D.C. 249, 249–50, 188 F.2d 48, 48–49 (1951); emphasis supplied.]

It is the improbability of the fortuities claimed by defendant, that supports the belief in guilt rather than the forbidden inference as to his disposition. *See, e. g.,* Federal Practice and Procedure, *supra,* § 5242 at 488.

two years earlier is too remote or dissimilar to the offense charged to be probative of intent.

██ We perceive no abuse of discretion by the trial judge in admitting the contested evidence. The government proffer and the bench conference gave the trial judge a basis on which to balance the probative value against the prejudicial effect of the evidence.[12] Upon review of the record, we are satisfied that the judge considered the factors relevant to the balancing before ruling. We conclude there was no error.

### IV.

Appellant's third claim of error is the trial court's inclusion of irrelevant and confusing statutory background material in the jury instructions. Appellant objects specifically to the trial judge's remarks with respect to D.C.Code 1978 Supp., § 11–2606(a): [13]

> After an attorney has been appointed under the Criminal Justice Act, the statute authorizes a payment to the appointed attorney only under certain situations, not in issue in this case, but which I will explain just as background for you.
>
> First . . . the two situations are these. First, if the court finds, after the appointment of counsel under the Criminal Justice Act, that the person, the client, is financially able to obtain counsel or to make partial payment for their representation, the court may terminate the appointment or authorize payment as the interest of justice may dictate through the means of a Court ordered contribution order; part payment or whatever portion.
>
> Second, if the Court finds, after the appointment, that funds are available for payment from or on behalf of the person who has been furnished representation, the Court may authorize or direct that such funds be paid to the appointed attorney. In both cases, however, it is the Court that determines and authorizes that payment may be made to the attorney by or on behalf of the person represented. *The law states in this regard that except as so authorized or directed no such person or organization may request or accept any payment or promise of payment for representing a defendant.* [Emphasis supplied.]

██ Appellant contends that, besides being extraneous, these comments permitted the jury to find appellant guilty of an offense not charged in the indictment (*i. e.,* failure to obtain court approval for payment or promise of payment). Appellant's argument, however, overlooks a basic principle of statutory construction: statutes in *pari materia* are to be construed together. 2A Sutherland, Statutory Construction § 51.03 (4th ed. C. Dallas Sands 1973). Section 2606(a) sheds light, as does the overall

---

12. The government proffered that approximately two years before appellant testified before a grand jury that he had violated the Criminal Justice Act by accepting money from a client named Margy Armstrong. The government stated further:

> The thrust of that grand jury testimony is, number one, Mr. Willcher was made aware of the Act; number two, that he is made aware that he should not ask people for money—for himself. And that the argument that I want to make is that after that appearance and after his promise that he would not accept money that it is inconceivable that he would not be very cautious and explain in great detail and keep notes and records, if he was going to go out and retain some other attorney.

13. D.C.Code 1978 Supp., § 11–2606(a), provides:

> Whenever the court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid to the appointed attorney, or to any person or organization authorized pursuant to Section 2605 of this title to render investigative, expert, or other services, or to the court for deposit in the Treasury as a reimbursement to the appropriation, current at the time of payment, to carry out the provisions of this section. Except as so authorized or directed, no such person or organization may request or accept any payment or promise of payment for representing a defendant.

*See also* 18 U.S.C.A. § 3006A(f) (1979). Although § 3006A(f) is virtually identical to D.C. Code 1978 Supp., § 11–2606(a), the federal statute has no parallel to the sanctions provided in the D.C.Act.

statutory scheme of the Act, on the conduct punished by § 2606(b) (see note 2 supra).

The legislative history of the District of Columbia Act indicates that § 11–2606(b) must be read in conjunction with § 11–2606(a), and that Section (b) is in fact the penalty provision for conduct proscribed by Section (a). As the Conference Report states:

> The Senate bill and the House amendment had identical provisions regarding the rendering of services other than counsel, and also had identical provisions *barring receipt of other payments if payment is to be made under this law, except that the Senate bill contained an additional provision providing for a fine of not more than $1,000 or imprisonment for not more than one year or both for individuals who seek or receive in any manner any additional payments.* [Congressional Conference Report, H.R.Rep.No. 93–1295, 93d Cong., 2d Sess. 8, *reprinted in* [1974] D.C.Code Legislative and Ad. Serv. 426; emphasis supplied.]

The federal and D.C.Acts specifically prohibit appointed counsel from requesting or accepting payments from the person represented or in his behalf except as authorized or directed by the court. *See* 18 U.S.C.A. § 3006A(f); D.C.Code 1978 Supp., § 11–2606(a); *United States v. Williams*, 536 F.2d 247 (8th Cir. 1976). Thus, those situations in which the court may authorize an attorney to receive "other payments" are clearly relevant to the offense defined by § 11–2606(b).

Under the Act, after "appropriate inquiry" by the court, persons eligible for appointed counsel (*i. e.,* financially unable to obtain adequate representation) are provided with legal services at public expense. *See* D.C.Code 1978 Supp., § 11–2602. The determination is subject to review or redetermination by the court if it appears at any time that the financial circumstances of the defendant change. D.C.Code 1978 Supp., § 11–2603.[14] If funds are found to be available, the court may terminate the appointment, authorize payment to appointed counsel, or direct reimbursement to the court if the attorney has received compensation. Thus, the Act seeks to protect the public interest by requiring a financially able defendant to repay or defray the cost of appointed counsel, consistent with the Act's purpose of ensuring assistance of counsel.[15]

■ The Act contemplates that this balancing will be done by the judge, not the attorney. Otherwise, forced to bear costs he can ill afford, the defendant must "try[] by some means to gather together funds to compensate the attorney whom he has not selected . . . ." *United States v. Senak,* 477 F.2d 304, 308 (7th Cir.), *cert. denied,* 414 U.S. 856, 94 S.Ct. 157, 38 L.Ed.2d 129 (1973), cited in *Gregory, supra* 393 A.2d at 141. Conversely, if funds are available to obtain counsel or ancillary defense services, or to repay costs, this fact should be brought to the court's attention for appropriate action.[16]

> Before a finding of "availability," can properly be made, the district judge should be satisfied that, in ordering reimbursement in any specified amount, the defendant will not suffer extreme hardship as a consequence of being deprived of his funds. [569 F.2d at 1199.]

14. In *United States v. Bursey,* 515 F.2d 1228, 1236 (5th Cir. 1975), the court stated that §§ 3006A(b), (c) and (f) of the federal Act (same as §§ 11–2602, –2603, –2606(a) of the District of Columbia Act),

> are to be read in *pari materia* insofar as they describe the manner of inquiry required of the Magistrate or court and the standards to be applied in determining the defendant's financial ability to provide for his own representation.

15. A third factor in the equation is the public interest in insuring that a defendant's dependents will not become societal charges. *See United States v. Bracewell,* 569 F.2d 1194, 1199 (2d Cir. 1978). In *Bracewell* the Second Circuit stated:

16. In fact counsel has a duty to alert the court to any question regarding the person's right to appointed counsel. See *Plan for Furnishing Representation to Indigents under the District of Columbia Criminal Justice Act,* adopted by the Joint Committee on Judicial Administration, Title III, Section D, effective November 29, 1974.

Thus, the court's discussion before the jury of § 11–2606(a), concerning which appellant complains, was far from superfluous background material and was an accurate statement of the law. Congress clearly sought to make illegal the request or acceptance of a fee by a court-appointed attorney from his client,[17] except where the court has first found the defendant financially able to bear the cost or funds are found to be available for payment. Given the pertinency of court approved payments to the charged offense, the cases cited by appellant are inapposite. In *United States v. Hill,* 417 F.2d 279, 281 (5th Cir. 1969), for example, the trial judge instructed the jury "on abstract principles of law which ha[d] no bearing on the case." *See also Polansky v. United States,* 332 F.2d 233, 236 (1st Cir. 1964) (improper reference made to a statutory section under which the defendant had been acquitted).

Rather than confusing the jury, the trial court's instructions clarified the crime charged.

*Affirmed.*

---

**17.** Under the Act, it is illegal for a person entitled to be compensated for services rendered under the Act to solicit money "*in return therefor.*" § 11–2606. Of course, it is for the jury to determine the purpose for which and for whom funds are solicited. The trial court here allowed appellant to assert the defense that he requested money for another, not for his own legal services. The jury obviously did not find his defense credible. *See Kenion v. United States,* D.C.App., 302 A.2d 723, 724 (1973).