Marion BRIDGES, Appellant,

v.

UNITED STATES, Appellee.

No. 10970.

District of Columbia Court of Appeals.

Argued Oct. 12, 1977.

Decided Dec. 20, 1977.

Daniel H. Brown, Washington, D. C., appointed by this court, for appellant.

Jonathan Lash, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Jason D. Kogan and Theodore A. Shmanda, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KERN, YEAGLEY and MACK, Associate Judges.

YEAGLEY, Associate Judge:

Appellant was convicted of three counts of rape while armed (D.C.Code 1973, §§ 22–2801, –3202), one count of rape (D.C.Code 1973, § 22–2801), three counts of first-degree burglary while armed (D.C.Code 1973, §§ 22–1801(a), –3202), one count of first-degree burglary (D.C.Code 1973, § 22–1801(a)), and one count of assault with a dangerous weapon (D.C.Code 1973, § 22–502).[1] He claims that the trial court erred in denying (1) a motion to sever counts, (2) a motion to suppress identification testimony, and (3) a motion for judgment of acquittal.

Between July and December of 1972, four women were raped in the Southeast section of Washington, D.C. In each case, a man broke into the victim's home during the early morning hours and awoke her with a threat of serious physical injury. The four rapes remained unsolved until early 1975, when, in the course of investigating another series of rapes, two Metropolitan Police detectives received information leading them to suspect appellant. Later, appellant was identified by each of the four women and the 14-year-old son of one of the victims.

Not all of the witnesses were certain of their identification of appellant's photograph. They were more positive of their lineup and in-court identifications.

Appellant's defense was alibi. Five witnesses testified that appellant and his wife had moved to Alabama in August 1972 and remained there until February 1973. The government called four rebuttal witnesses who controverted appellant's claim that he was in Alabama during the period in which the four rapes occurred.

I.

Appellant's first claim concerns the trial court's denial of his motion to sever the counts of the indictment in a manner which would afford him a separate trial as to each of the four incidents.

Super.Ct.Cr.R. 8(a) and D.C.Code 1973, § 23–311(a) provide for permissible joinder of offenses in certain cases:

Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

A defendant may, however, seek relief from a prejudicial joinder, under Super.Ct.Cr.R. 14 and D.C.Code 1973, § 23–313:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires.

Here, the offenses were tried together over the timely protest of appellant. The question, therefore, is whether the trial record manifests a sufficient possibility of undue prejudice by reason of such joinder to indicate an abuse of discretion by the trial

---

1. Appellant was sentenced to a total term of 33 to 100 years' imprisonment.

judge. *See Calhoun v. United States,* D.C. App., 369 A.2d 605, 608 (1977); *Coleman v. United States,* D.C.App., 298 A.2d 40, 42 (1972), *cert. denied,* 413 U.S. 921, 93 S.Ct. 3070, 37 L.Ed.2d 1043 (1973).

■ In this case, joinder of offenses was permissible because the crimes were "of the same or similar character." When, however, offenses of a "similar character" are joined for trial, there is a substantial risk of prejudice. First, there is the possibility that the jury might conclude that a person accused of so many misdeeds must have committed some crime, and may therefore cumulate the evidence against him. Second, proof that the defendant has committed one offense might be used to convict him of a joined offense even though the evidence of the latter might otherwise be insufficient. *See* Wright, Federal Practice and Procedure § 222 at 437 (1969). Our cases therefore require that when joinder of offenses is based on the fact that the crimes are of a "similar character," a motion to sever should be granted unless (1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, or (2) the evidence of each of the joined crimes would be admissible at the separate trial of the others. *Tinsley v. United States,* D.C.App., 368 A.2d 531 (1976); *Drew v. United States,* 118 U.S. App.D.C. 11, 331 F.2d 85 (1964). In this case, the government contends that evidence of each of the rapes would have been admissible at the separate trial of the others and therefore the denial of the motion for separate trials was appropriate.

■ The general rule is that the prosecution may not introduce evidence of other criminal acts in order to show the defendant's general bad character, or his tendency to commit the particular offense charged. *Tinsley v. United States, supra* at 533.

The rule is that the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is substantially relevant for some other purpose than to show a probability that he committed the crime on trial because he is a man of criminal character. [McCormick, Evidence § 190 at 447 (2d ed.1972).]

There are, however, numerous purposes for which evidence of other criminal acts may properly be offered.

Evidence of other crimes is admissible when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial. [*Drew v. United States, supra* at 16, 331 F.2d at 90.]

Here, evidence of each of the joined crimes would not have been admissible at the trial of the others as relevant to motive, intent, or absence of mistake or accident. Our inquiry must therefore focus on whether such evidence would have been admissible under the common scheme or identity exceptions.

Proof of other criminal acts is admitted under the common scheme or identity exceptions, if the evidence shows that the defendant has committed crimes so nearly identical in method that it is likely that the present offense has been committed by him. McCormick, Evidence, *supra* at 449.

[I]f the facts surrounding the two or more crimes on trial show that there is a reasonable probability that the same person committed both crimes due to the concurrence of *unusual* and *distinctive* facts relating to the manner in which the crimes were committed, the evidence of one would be admissible in the trial of the other to prove identity. In such cases the prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials. [*Drew v. United States, supra* at 16, 331 F.2d at 90 (emphasis supplied) (footnotes omitted).]

These principles are well illustrated by two recent opinions of this court. *Compare Tinsley v. United States, supra, with Arnold*

## 1076

*v. United States,* D.C.App., 358 A.2d 335 (1976) (en banc).

In *Tinsley,* the defendant was convicted of two homicides. The first victim was found fully clad and submerged in running water in the bathtub of his apartment. He had been strangled with bare hands. Tinsley was known to have been drinking with him before his death. The second victim was discovered six months later in the back of a truck, strangled to death with a wire like ligature. He had been last seen alive drinking with Tinsley and a night watchman at a building owned by their common employer. We held that the mixture of facts and circumstances common to the two homicides was not so unique that evidence of one would have been admissible at the separate trial of the other.

In both cases the homicides were by strangulation and the victim had been seen drinking with Tinsley. However, the methods of strangulation were different, and the injuries to the two victims were not of such a unique character as to suggest a "signature" of the killer, *see People v. Haston,* 69 Cal.2d 233, 70 Cal.Rptr. 419, 444 P.2d 91 (1968) (en banc). Furthermore, the crimes were distant in time and location.

In *Arnold v. United States, supra,* the defendant was convicted of two separate rapes. We found the two offenses to be so strikingly similar that proof that the defendant had committed one would have been admissible at the separate trial of the other to show that it bore the defendant's trademark.

[I]n each case the rapist, driving a light blue Volkswagen, invited the victim into the automobile as an act of friendly concern and for an apparently innocent purpose. In each case the friendly attitude of the rapist changed suddenly, and without provocation, to one of anger accompanied by threats of bodily harm and death, because of some injury allegedly perpetrated on him or some one of his relatives

by the victim or some one of her relatives. In each case the rape was accomplished by first putting the victim in fear of her life and then apparently abandoning that purpose and demanding and obtaining submission to sexual intercourse. Finally, after each rape the victim was treated kindly and returned to her destination. [*Id.* at 338–39.]

We therefore held that the trial court did not abuse its discretion in denying the motion to sever.[2]

A detailed analysis of the facts in the present case is needed to determine whether there has been an abuse of discretion. The first rape occurred on the morning of July 2, 1972. The victim had been at a party and returned alone to her apartment at 620 Mellon Street, S.E., at about 3:30 a.m. She went immediately to bed and fell asleep, awakening when a man got on her bed. He placed a knife against her back and told her not to scream or he would kill her. Then, ordering her to roll from her side onto her stomach, he cut off her panties, climbed on her back and raped her. When the intruder had finished, he ordered her to lie on her side facing the window and not to look at him. The lights were off in the bedroom, but the room was lit by a light in the bathroom, and she could see well enough to realize that she had seen her assailant on several mornings walking a woman to the bus stop. Several times during the incident he walked nervously back to the kitchen, telling her that the police were looking for him. Before leaving, he asked where her phones were, and then cut the wires to both phones. Finally, after threatening to kill her, or "better still" to "send [her] up in smoke" if she told the police, he left the apartment through the back door.

The victim reported the rape that morning and gave a full statement of what had taken place. She described her attacker as a black man in his early twenties, of medium build, 5′6″ or 5′7″ tall, with a short bush haircut.

**2.** In a number of cases from other jurisdictions, evidence of prior rapes has been admitted as relevant to identity under circumstances extremely similar to those in *Arnold*. E. g., Peo-

ple v. Whitehorn, 60 Cal.2d 256, 32 Cal.Rptr. 199, 383 P.2d 783 (1963) (en banc); *State v. Finley,* 85 Ariz. 327, 338 P.2d 790 (1958); *Rhine v. State,* 336 P.2d 913 (Okl.Cr.1958).

The second rape occurred on November 1, 1972. The victim had spent the evening in her apartment at 3442 Croffert Place, S.E., with her infant daughter and boyfriend. She went to bed around 11 p.m. Three hours later her boyfriend awakened her to say he was leaving. About twenty minutes later she was awakened again when a man sat down on the edge of her bed and touched her shoulder. As soon as her eyes focused, she realized that the man on her bed was a stranger. He leaned over her, smiled, told her he knew she was alone, and warned her not to do anything, reminding her that her daughter was on the bed beside her. Although the victim did not see a weapon, she felt a cold, hard object which she took to be a gun. After he had been there for about five minutes, the stranger put a towel over her face, but not before she had gotten a look at him as he leaned over her. The bedroom lights were off, but the television set was on, lighting the room with its screen, and the light from the bathroom across the hall shined into the bedroom. The woman wore only a nightgown, and as soon as he had covered her face, the intruder performed oral sodomy on her and then had intercourse with her for about ten minutes, stopping after he had climaxed. He told her that if she lay still he would not cut her phone wires, and then he left by the back door. She later found a living room window open and the couch in front of it moved out of place. She described the man who had raped her as about 20 years old, with a close-cut afro haircut, 5′10″ tall, weighing 135 pounds, brown skin, medium nose and eyes, and wearing heavy boots and jeans and an orange shirt splattered with paint.

The third rape occurred on Sunday, November 4, 1972. At approximately 1 a.m., a woman returned from a party to her home at 3664 B Street, S.E., where she lived alone. She fell asleep on a couch in her underwear. At about 2 a.m. she awoke, feeling that she was suffocating, and found a man bending over her, a handkerchief in her mouth and a "cold object" in her left ear. He told her, "Don't scream or I'll kill you." She gestured her assent, and he let her sit up. Then she saw that he had a gun. Trying to win his confidence, she talked with him and asked if she could smoke a cigarette. He told her not to "try anything" and they both smoked. He told her he was an escapee and she noticed that he occasionally smiled a "funny smile." The room was lit by a streetlight outside the window which shined brightly into the apartment, allowing the woman to see the intruder's face.

After about ten minutes the man demanded that she take off her brassiere and panties, and then he had intercourse with her, first on the living room couch where she had been sleeping and then in her daughter's bedroom. When he left the apartment he went out the kitchen window rather than the front door because "the police were already looking for him." After her attacker left, the woman ran onto the street and flagged down a police cruiser. She reported the rape and described the rapist as dark-complexioned, 25 to 28 years old, of average build, 5′9″ tall, weighing 145 to 150 pounds, with a close-cut bush, and wearing boots.

The final incident occurred during the early morning hours of December 16, 1972. The victim had spent the evening at her home at 3321 B Street, S.E., where she lived with her four children. She fell asleep watching television in the living room and was awakened by a man leaning over her, poking her in the stomach with a sharp object and saying, "Wake up." She screamed for her 14-year-old son. As the intruder pulled the loosely crocheted hat she was wearing over her eyes, the boy came into the room and told the man to leave his mother alone. The man pulled a gun from his pocket and fired one shot, missing the boy's head by a few inches. The man told him to "get back," and he did. The room was lit by the television set and by a 60-watt bulb in the dining area.

After the youth's retreat, the intruder cut off his victim's pants, ordered her to remove her underwear, and, still dressed in his pants and muddy boots, raped her. He fled when someone knocked on the back

door. Later, the victim discovered that the wire to her phone had been cut. She described the man who had raped her as a black man, about 20 years old, 5'10" tall, with a medium bush haircut.

■ In this case, there is no one characteristic common to the four crimes which is so unique as to alone support the mutual admissibility of the evidence at separate trials. The test of mutual admissibility, however, does not require that a *single* characteristic be so unique as to lead to the conclusion that all were committed by the same person. *See Goins v. United States,* D.C.App., 353 A.2d 298 (1976). As Dean Wigmore stated:

> Rarely can one circumstance alone be so inherently peculiar to a single object. It is by adding circumstance to circumstance that we obtain a composite feature or mark which as a whole cannot be supposed to be associated with more than a single object.
>
> The process of constructing an inference of Identity thus consists usually in adding together a number of circumstances, each of which by itself might be a feature of many objects, but all of which together make it more probable that they coexist in a single object only. Each additional circumstance reduces the chances of there being more than one object so associated. [2 Wigmore on Evidence § 411 at 385–86 (3d ed. 1940).]

Here, we find that when circumstance is added to circumstance there is a "composite feature or mark" indicating that the four crimes were committed by the same person.

■ Each incident began with the assailant breaking into the victim's dwelling between 1 a.m. and 4:45 a.m. All four rapes occurred in the same general area of Southeast Washington, D. C.; three of the incidents took place within a three block area. At the time of each rape, appellant was living in the neighborhood. Also, the four crimes were committed within a six-month period of time and two of the incidents occurred within a few days of one another.

In each case, the victim was the only adult in the dwelling. The assailant entered through the rear of each victim's apartment, awoke her, threatened her with a weapon, and then demanded silence and submission. When the victim complied, the assailant committed no act of violence, sadism or brutality. His single act of violence, the shot fired at his fourth victim's son, was in response to a failure to comply with an order.

Each rape culminated in an apparently completed act of intercourse after which the rapist fled. Only one of the incidents involved any form of sexual activity other than intercourse. None involved repeated sexual acts over a prolonged period. In at least three of the cases, although the front door was available to him, the culprit left as he had come, through the rear. In three of the cases, the intruder sought to prevent his victims from getting a good look at him. In the same three cases he cut or threatened to cut the lines on his victims' phones. The only time he did not take these precautions was during the third rape when the victim acted as though her submission was so complete that he need not fear detection or disclosure of his identity. In the two instances in which the victims wore some type of pants, the intruder cut those garments off.

We realize that in this case, the mixture of facts and circumstances common to the four rapes is somewhat less unique than in *Arnold v. United States, supra.* Although we cannot say that we would have reached the same conclusion had we been in the position of the trial court, we hold that the trial court did not abuse its discretion in denying appellant's motion to sever. We would observe, however, that when joinder is sought involving crimes such as rape, the risk of prejudice is substantial. We therefore admonish that in such cases a trial court should give very careful consideration to the nature and extent of possible prejudice in weighing the advantages of joinder.

## II.

■ Appellant's other claims relate to the photographic, lineup, and in-court iden-

tification of him, and the sufficiency of the evidence. In seeking to determine the identity of the perpetrator of a crime, the government must avoid the use of procedures "so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *accord, Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In this case, the trial court made detailed findings concerning the photographic arrays used by the government and the lineup procedure, and found that neither was unduly suggestive. Appellant does not attack these findings. Instead, he claims that the circumstances surrounding his identification were inadequate because of the insufficient opportunities for observation available to the witnesses. His position is contrary to the rule that

> [s]uppression of identification testimony because it is deemed too weak is not proper. That is the function of a timely judgment of acquittal. [*Brown v. United States,* D.C.App., 349 A.2d 467, 468 (1975).]

We therefore conclude that appellant's argument regarding his identification is lacking in merit.

■ In considering whether the evidence was sufficient to support a conviction, we must make full allowance for the right of the trier of fact to determine credibility, weigh the evidence, and draw justifiable inferences of fact. *Manago v. United States,* D.C.App., 331 A.2d 335, 336 (1975). A conviction will not be reversed if there is evidence which reasonably permits a finding of guilt. *Patterson v. United States,* D.C.App., 301 A.2d 67, 70 (1973). Here, the evidence was more than sufficient for a reasonable person to find beyond a reasonable doubt that appellant was guilty of the crimes charged.

The judgment below is

*Affirmed.*