**Donald E. GATES, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 82–1529.**

District of Columbia Court of Appeals.

Argued April 4, 1984.

Decided Aug. 21, 1984.

Hamilton P. Fox, III, Washington, D.C., for appellant.

Robert H. Klonoff, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before NEWMAN, Chief Judge,* NEBEKER, Associate Judge, and GALLAGHER, Associate Judge, Retired.

NEBEKER, Associate Judge:

Appellant was indicted on the following charges: attempted armed robbery, D.C. Code §§ 22–2902, –3202 (1981); rape while armed, *id.* §§ 22–2801, –3202; first degree murder while armed, *id.* §§ 22–2401, –3202; felony murder, *id.;* and carrying a pistol without a license, *id.* § 22–3204. A jury found him guilty of the armed rape, murder and pistol offenses. He was sentenced to fifteen years to life (rape), twenty years to life (murder, concurrent with the rape sentence) and three to ten years (pistol, consecutive to the other sentences). Before us now, he challenges: (1) the admission of certain "other crimes" evidence offered by the prosecution; (2) the nonadmission of certain "other crimes" evidence which he sought to introduce; (3) the alleged withholding by the government of evidence; (4) asserted improper statements

---

* NEWMAN, Chief Judge, concurs in the result only.

by the prosecution during its closing argument; and (5) sufficiency of evidence regarding the nature of the weapon involved in the crime. We perceive no reversible error among the assignments made by appellant and, accordingly, affirm.

**I**

Catherine Schilling, a twenty-one-year-old student at Georgetown University, was raped and killed sometime after she left work at the Watergate complex, on June 22, 1981. Her body was found on a bank of the Rock Creek with five bullet wounds to the head and sperm in her vagina. Her purse lay nearby, apparently undisturbed. A paid informant told police that a man, identified before and at trial as the appellant, had told the informant that: he had tried to rob "a young, pretty white girl;" she resisted, so he raped her; after reflection on the consequences of his actions, he shot her and left her in a park. (Tr. at 10–12).

At trial, the prosecution presented, *inter alia*, testimony from the informant, a hair and fiber analyst, a serologist and a woman who had been assaulted by appellant in June 1981. The defense presented, *inter alia*, its own expert testimony on pubic hair matching and serology.

**II**

**A.**

■ Appellant challenges the admission of other crimes evidence introduced by the government. Miss Nancy Benoff testified at trial that on June 3, 1981, she left her job at the Kennedy Center and walked along Rock Creek Parkway towards the canal towpath. It was rush hour, about 4:15 p.m. The appellant followed her. As she was about to turn on to the towpath he grabbed her from behind and attempted to snatch her purse. She resisted. He then seemed to lose interest in the purse while he grabbed her by the shoulders, pushed

her down into the grass, laid on top of her and nuzzled his face against hers. Benoff continued to clutch on to her purse while she screamed wildly. Help came, apparently within seconds. Appellant was arrested and a search of his clothes produced from a pocket an unsheathed knife with a blade length of four to five inches.[1] Appellant subsequently pled guilty to attempted robbery in connection with the incident.

Several steps were taken during the trial to impress upon the jury the idea that this other crimes evidence was admitted to show only intent, identity or common plan or scheme, and not to show a predisposition towards criminal acts. First, the jurors were specially examined during *voir dire* as to whether each felt able to apply the evidence in the prescribed, limited manner. Second, a cautionary instruction was administered immediately after the testimony was received. Third, counsel for both sides included mention of the limited use in their closing arguments. And the trial court's final charge to the jury included the standard limiting instruction.[2]

The defense's pretrial efforts to prevent admission of this evidence failed; the trial court found, based on *Calaway v. United States*, 408 A.2d 1220, 1225–27 (D.C.1979), sufficient similarities, and it concluded that the probative value outweighed any prejudicial effect. Specifically with regard to the similarities, the trial court found the following: (1) the locations of the assaults were within a few hundred yards of each other; (2) they occurred only nineteen days apart; (3) both victims were white females in their twenties (carrying shoulder bag purses); (4) both victims were walking along the same path; (5) both assailants were armed, albeit one with an unopened knife and the other a gun; (6) both incidents began as robberies and became sexual assaults; (7) both occurred when traffic was heavy on the Rock Creek Parkway—Benoff during evening rush hour and

---

1. Details concerning the arrest and search were corroborated by the arresting officer.

2. Criminal Jury Instructions for the District of Columbia, No. 2.49 (3d ed. 1978).

Schilling as a concert crowd was leaving the Kennedy Center; and (8) the pubic hairs of the assailant and that recovered from the victim's body matched.

Appellant launches extensive attacks on each similarity found by the trial court, and he further argues that the prejudicial effect of admitting the evidence outweighed any probative value. The government counters that the sum of the similarities suffice under extant case law to establish identity, intent and common scheme or plan and that any prejudice is outweighed by the probative value of the evidence, particularly in light of the prophylactic efforts taken by the court and the prosecutor at trial. We conclude, admitting the closeness of the question in this case, that the trial court did not err in admitting this other crimes evidence.

### B.

The seminal case in our jurisdiction, *Drew v. United States*, 118 U.S.App. D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964), succinctly sets out the doctrinal concerns:

> It is a principle of long standing in our law that evidence of one crime is inadmissible to prove *disposition* to commit crime, from which the jury may infer that the defendant committed the crime charged. Since the likelihood that juries will make such an improper inference is high, courts presume prejudice and exclude evidence of other crimes unless that evidence can be admitted for some substantial, legitimate purpose....
>
> Evidence of other crimes is admissible when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial. When the evidence is relevant and impor-

tant to one of these five issues, it is generally conceded that the prejudicial effect may be outweighed by the probative value. [Footnotes omitted; emphasis in original.]

In addition, the admission of other crimes evidence need not depend on the presence of one distinctive similarity but the court can consider the totality of the factual circumstances which, amalgamated, lay a sufficient basis for admission under the *Drew* doctrine. *Warren v. United States*, 436 A.2d 821, 833 (D.C.1981) (citing *Bridges v. United States*, 381 A.2d 1073, 1078 (D.C. 1977), *cert. denied*, 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978)); *Calaway v. United States*, 408 A.2d 1220, 1226–27 (D.C.1979). Also, the probative value of the evidence offered must be weighed against its prejudicial effects. *Willcher v. United States*, 408 A.2d 67, 75 (D.C.1979). Finally, we recognize our standard of review is whether the trial court abused its discretion in admitting the evidence. *Id.* at 75; *United States v. Bobbitt*, 146 U.S.App. D.C. 224, 228, 450 F.2d 685, 689 (1971).

In this case we find sufficient similarities: (1) the locations of the assaults were within a few hundred yards of each other, along the towpath, *see Warren v. United States*, 436 A.2d 821, 832–33 (D.C.1981); *Bowyer v. United States*, 422 A.2d 973, 977 (D.C.1980); *Bridges v. United States*, *supra*, 381 A.2d at 1078; (2) a nineteen day hiatus separated the crimes, *see Brooks v. United States*, 448 A.2d 253, 256 (D.C. 1982); *Calaway*, *supra*, 408 A.2d at 1227; *Willcher*, *supra*, 408 A.2d at 77; (3) both victims were white females in their twenties, *see Warren*, *supra*, 436 A.2d at 832; *Bowyer*, *supra*, 422 A.2d at 977; *Calaway*, *supra*, 408 A.2d at 1226; (4) record testimony [3] revealed that both incidents began as robberies but turned into assaults, *see Brooks*, *supra*, 448 A.2d at 257; *Arnold v. United States*, 358 A.2d 335, 338–39 (D.C. 1976) (en banc); (5) at least nearby auto

---

**3.** Benoff's testimony with regard to the assault on her and Smith's testimony with regard to the assault on Schilling.

traffic was heavy at the time of the assaults evidencing boldness, *see Warren, supra,* 436 A.2d at 832–33; *Bridges, supra,* 381 A.2d at 1078. The calculus of these factors establishes sufficient basis for the common plan or scheme or identity prongs of the *Drew* test.

Appellant further argues that whatever probative value this evidence has, that value is outweighed by the prejudicial effect of the admission of this evidence. It is but a truism that any probative evidence is inherently prejudicial. The court in *Drew* was certainly cognizant of such prejudicial effects but went on to allow "relevant and important evidence that fell into one or more of the prescribed categories." *Drew, supra,* 118 U.S.App.D.C. at 16, 331 F.2d at 90. Here, the evidence is clearly probative, *i.e.,* certainly identity was relevant and this evidence was material to that issue. *Willcher, supra,* 408 A.2d at 75. Moreover, the question of identity was important, *Drew, supra,* 118 U.S.App.D.C. at 16, 331 F.2d at 90, to the Schilling murder which was perpetrated without a known witness. *See Warren, supra,* 436 A.2d at 833. As for prejudice to the appellant, the Benoff and Schilling incidents were presented at trial as sufficiently distinct events such that jurors would not likely, unwittingly confuse the two. Moreover, the prophylactic steps taken by the court in *voir dire,* its instructions and the government's arguments to the jury could only reinforce in the jurors' minds that the incidents were separate and the other crimes evidence was admissible for only the prescribed, limited purposes. *Cf. Jones v. United States,* 477 A.2d 231, at 241–242 (1984); *Page v. United States,* 438 A.2d 195, 198 (D.C.1981); *Bittle v. United States,* 410 A.2d 1383, 1387 (D.C.1980) (per curiam). Though the other crimes issue is a sensitive one which calls for a careful balancing to insure against improper prejudice, our role is limited to affording deference to trial court rulings that appear carefully considered after proper objection by the defense. That care is abundantly apparent here particularly as to the limiting instruction and precautions. Our scope of review is thus limited to an abuse of discretion standard. We fail to preceive any abuse in the exercise of discretion in the trial court's balancing of probative value and the prejudice.

As we allowed in *Bridges,* "We recognize that in this case, the mixture of facts and circumstances common to the four rapes is somewhat less unique than in *Arnold v. United States, supra.*" *Bridges, supra,* 381 A.2d at 1079. Nevertheless, we find here, as we did in *Bridges,* that the trial court did not err in admitting this other crimes evidence. *See Brooks, supra; Warren, supra; Calaway, supra; Willcher, supra.*

### C.

■ Appellant challenges another evidentiary ruling concerning other crimes evidence. This time the appellant wanted to introduce evidence regarding an incident wherein he was wrongly accused of a rape—appellant was incorrectly identified as the attacker. The trial court ruled the evidence inadmissible. We agree.

Apparently, on March 10, 1981, a woman was raped in the Rock Creek Park area. Shown a photo array, she identified the appellant as her assailant. After his arrest, the charges were dropped when it was learned that he was incarcerated at the time of the incident. At the close of the government's case, the defense sought to introduce testimony, from the police officer who presented the photo array, regarding the identification of the appellant as the March 10th rapist. The defense also proffered records showing that appellant was incarcerated at that time. As we see it, appellant's proffer consisted of assertions that (1) a rape occurred, (2) in the Rock Creek Park area, (3) on March 10, 1981, (4) for which appellant was identified and arrested, but (5) during which time he was in the D.C. Jail. (Tr. 307–10, 313.) Defense counsel wanted to introduce the police testimony and jail records in order (1) to argue

that the appellant had a look alike who was a rapist and (2) to blunt the prejudicial effect of the Benoff testimony with evidence that the appellant was not the perpetrator of another similar crime. (Tr. 307–09.) The trial court ruled that the testimony of the police officer was inadmissible because the testimony was hearsay as to the victim's identification of appellant, and it ruled that the testimony and the prison records were inadmissible because the defense's proffer was inadequate to establish probative similarities pursuant to the *Drew* doctrine. As to the issue of the defensive use of the *Drew* doctrine, assuming without deciding that evidence of other similar crimes committed by someone other than the appellant can be introduced by the appellant, *see United States v. Sampol*, 204 U.S.App.D.C. 349, 384–86, 636 F.2d 621, 656–58 (1980); *United States v. McClure*, 546 F.2d 670, 672–73 (5th Cir.1977), the proffer at trial was inadequate and we, therefore, perceive no abuse of the exercise of discretion by the trial court, *United States v. Bobbitt, supra,* 146 U.S.App.D.C. at 228, 450 F.2d at 689, in its ruling. Here, the defense proffered hearsay testimony (the defense asserted that it was unable to locate the victim) that on March 10 a rape occurred in Rock Creek Park. Unfortunately, rapes come in many distinctive forms, *e.g., Brooks, supra; Arnold, supra;* the proffer is devoid of the unsavory but necessary details regarding mode of operation, characteristics of the victim, time and conditions of day, etc. Rock Creek Park is a large park with various scenari; again the proffer was devoid of details. In contrast, for example, to the details over which we labored in Part II, Section B, *supra,* the only actual details proffered in regard to the March incident were the date and the fact that the appellant was misidentified. We fail to see sufficient basis for the defense to have argued identity, common plan or any other of the *Drew* categories which might arguably be tailored to create enough doubt to distinguish the two incidents. Accordingly, we cannot find error. *Cf. Jones, supra,* at 239–240 (citing *Camp-*

*bell v. United States,* 450 A.2d 428, 430 n. 7 (D.C.1982)); *United States v. Sampol, supra,* 204 U.S.App.D.C. at 385–86, 636 F.2d at 657–58.

 As to the challenge regarding only the police officer's testimony as admissible hearsay, appellant basically argues that since some victim misidentified appellant, then Smith, the police informant, similarly misidentified appellant. On the basis of this line of reasoning to support his argument of relevance, appellant argues that the testimony is properly admissible under the hearsay exception for identification. We cannot agree. The identification exception requires the identifier to be available at trial for cross-examination. *Rice v. United States,* 437 A.2d 582, 583 (D.C. 1981) (per curiam); *Morris v. United States,* 389 A.2d 1346, 1350–51 (D.C.1978). The identifier here, the victim of the March 10 rape, could not be located by appellant. We see no error.

## IV

### A.

Appellant raises two challenges regarding the expert testimony given at trial. At the scene of the Schilling homicide, four serological swabs were taken from the victim's vagina. Two of the swabs were dispatched to the FBI to test for blood type and other distinguishing characteristics and two were sent to the District's Medical Examiner (Tr. 349). The defense at trial called upon two expert witnesses, the first of whom was Maureen Higgins, the FBI serology expert who performed the tests on the two swabs sent to the Bureau. In her report, available before trial to the defense and the government, Miss Higgins reported that one swab, labeled Q–11, showed "inconclusive" results; *i.e.,* Higgins could not reliably identify the blood group(s) involved. The other swab, Q–12, showed only type O blood group substances. (Tr. 350.) The victim had type O blood and the appellant type A; both were

secretors.[4] The nature of the inconclusive results of Q–11 was not further explored by either side during direct, cross, redirect and recross-examination of Miss Higgins when she was called as a defense witness.

The defense next called Dr. Walter Rowe, Associate Professor of Forensic Sciences, to testify regarding, *inter alia*, serological matters. During direct-examination there was some discussion of "scrambling," the changing of blood group substances where bacteria are introduced into body cavities. The following interchange developed:

Q. So you expect to find Type O, Type A and Type B scrambled together?

A. The existing literature on bacterial contamination on bodily fluid seems to suggest that it, very strongly, that this kind of scrambling takes place; that A get converted. Some of the A get converted to B. Some may get converted also to H or something that is not even detectable. (Tr. 406.)

In cross-examination, the following colloquy ensued:

Q. When did you first examine the report of Dr. Luke?

A. I looked at Dr. Luke's report last night when we were discussing—

Q. That was the first time?

A. That was the first time.

Q. When was the first time you saw the report? And that was just the form type report from the FBI concerning Ms. Higgins' [sic] body. When did you first see that?

A. I first saw the actual report last night also.

Q. You talked about scrambling. And that if there was scrambling you would—and there was—let's assume scrambling as a result of bacterial activity and the presence of A blood group substances. What would you expect to see?

A. I would expect to start seeing some B blood group substances.

Q. You—and so in your opinion the presence of a Type B reading would indicate—could indicate scrambling that would distort what had been the presence of Type A?

A. That's correct.

Q. Professor Rowe, are you aware that there were two swabs that were taken of the vagina of Catherine Schilling sent to the FBI?

A. Yes.

Q. Were you aware that one of the swabs showed a weak positive for Type B blood group substance?

A. No, I was not aware of that. [Tr. 412–13.]

Defense counsel also stated that he was unaware of this asserted fact. Then Miss Higgins was again called to testify, this time in the prosecutor's rebuttal. She stated that inconclusive in reference to the Q–11 swab meant that there was a weak B type reading along with a strong type O reaction.

Finally, in its closing argument, the prosecution described Dr. Rowe's testimony concerning scrambling as follows:

Finally, ladies and gentlemen, in that regard, the expert from George Washington University, the person who was qualified as an expert in the area of serology, testified that he would only expect bacterial activity. He would only expect that bacterial activity as naturally occurs in the vagina in such circumstances would mask a reading of Type A blood group substances on those swabs. He would see an indication of that if there was a false B reading. And you found out from the expert—

[DEFENSE COUNSEL]: Objection, Your Honor, may we approach the bench. [sic]

THE COURT: All right.

---

4. Secretors, in this context, are individuals whose blood types can be determined by examination of such other bodily fluids as saliva. Both the victim and appellant were secretors. Appellant's blood type was determined by examination of his saliva.

[Thereupon, counsel for both parties approached the bench and conferred with the Court, as follows:]

[DEFENSE COUNSEL]: Your Honor, that is misstating the expert's testimony. [Tr. 460.]

The trial court did not agree with the defense but nonetheless immediately instructed the jury that its recollection of the evidence controlled over recollections made by counsel.

### B.

Appellant launches two challenges: the government suppressed the evidence regarding the weak B reading in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); the comments regarding scrambling of A to B distorted Dr. Rowe's testimony, thereby confusing the jury and prejudicing the appellant. We find error in neither regard.

■ As to the suppression argument, the FBI report was available to and examined by appellant and both of its experts before trial (Tr. 403). Miss Higgins was certainly available to the defense for its pretrial preparation; she was originally called as a defense witness. We perceive no concealment, *see United States v. Agurs*, 427 U.S. 97, 109, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). Rather, we suspect that an ambiguous term was better investigated by one side, which side may have strategically timed the introduction of its research. Moreover, we do not detect unfair advantage favoring the government. Although appellant's counsel may not have been "an expert in serology" (Reply Brief of Appellant at 13), both experts, Higgins of the FBI and Dr. Rowe of George Washington University, were available to the defense before trial. Finding no concealment, we only note the following: the timing of the disclosure, during not after trial, *id.*, 427 U.S., at 108, 96 S.Ct. at 2399: *Brady v. Maryland, supra* (post-sentencing disclosure of date relevant to sentencing); *see United States v. Flaherty*, 668 F.2d 566, 588–92 (1st Cir.1981), casts doubt as to whether any possible prejudice to the appellant could have been avoided by action on his part; the inconclusive nature of the record evidence regarding scrambling and a weak B reaction casts significant doubt as to whether materiality could be established. *Agurs v. United States, supra,* 427 U.S. at 109, 96 S.Ct. at 2400.

■ As to the misstatement contention, although the government could have more fairly argued the scrambling evidence, we find sufficient record evidence to support its version of the testimony. *Smith v. United States*, 315 A.2d 163, 167 (D.C.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974). We have noted the record evidence developed during direct and cross-examination, *supra* at Part IV-A. We also agree with the trial court that Dr. Rowe's testimony was not particularly clear nor consistent when viewed in its entirety.[5] Moreover, the trial court immediately administered the appropriate curative instruction. *Donnelly v. DeChristoforo*, 416 U.S. 637, 644, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974); *Harris v. United States*, 430 A.2d 536, 541 (D.C.1981). Further, appellant's counsel suggested in his closing argument that the prosecution had misstated the evidence and appellant's counsel then asserted his own recollection of the testimony. In sum, we see no error in this regard.

### V

■ Appellant's final challenge concerns the sufficiency of the evidence regarding the weapon used in the Schilling homicide. The weapon was never recovered by police. Evidence introduced at trial traced spent bullets found a few feet from the victim's head as coming from a "revolver." Possible manufacturers were suggested by the ballistics expert, Mr. Voorhees. Appellant's timely motion for acquittal on the weapon's charge was denied.

---

5. For example, compare Tr. 412–13, *supra*, to Tr. 417 (the first questions on redirect).

Appellant argues that the prosecution never introduced evidence that a "pistol," a weapon with a barrel of 12 inches or less was used. D.C.Code § 22–2301(a) (1981). Appellant urges that the weapon was only identified as a "revolver" and this term describes the chamber action not the barrel length. Thus, appellant argues, there was no record evidence that a pistol was used, hence the conviction on the weapon's charge must be reversed.

Our review of the record reveals sufficient evidence, viewed in the light most favorable to the prevailing party at trial, to make out a jury question. *United States v. Harris*, 140 U.S.App.D.C. 270, 284, 435 F.2d 74, 88 (1970), *cert. denied,* 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 152 (1971); *Curley v. United States*, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). Throughout his testimony, Voorhees referred to the weapon as a revolver. During cross-examination, the following colloquy developed:

Q. Now, would you explain to the ladies and gentlemen of the jury the difference between a revolver and an automatic?

A. Simply put, a revolver is a wheel gun. It has a revolving cylinder into which a number of rounds of ammunition can be loaded. As the weapon is cocked or as the trigger is pulled, the cylinder indexes behind a single barrel. The hammer falls and is dropped on a primer, a live round that discharge occurs. The bullet jumps from the cylinder to the barrel and then goes through the barrel. It is just like the *police revolvers*, the *western revolvers*. It has a wheel at the rear of the cylinder. A semiautomatic pistol, I would assume you mean?

Q. I stand corrected.

A. Would be—standard United States military .45 caliber semiautomatic *pistol* or the *German Luger*, but the rounds of ammunition are stored not in a cylinder not in a wheel but rather stacked one on top of another in a magazine that is

housed in the *grip* of the firearm, and through a series of mechanical operations are brought one at a time into the barrel and are discharged each single pull of the trigger.... [Tr. 224–25; emphasis added.]

It is clear that Voorhees' references in the colloquy to revolvers were premised on the assumption that he was talking about pistols. The jury could have taken note of this and, further, could have reasonably inferred that this assumption applied to his whole testimony. Finally, we must consider whether Voorhees' reference to a pistol comported with the statutory definition; we so conclude. *See State v. Emmsley,* 3 Hawaii App. 459, 652 P.2d 1148, 1152–53 (1982); *Commonwealth v. Sperrazza,* 372 Mass. 667, 363 N.E.2d 673 (1977).

Finding no error in appellant's assignments, we

*Affirm.*