Robert H. HARPER, Appellant,

v.

UNITED STATES, Appellee.

No. 86–1713.

District of Columbia Court of Appeals.

Argued Jan. 19, 1989.
Decided March 27, 1990.
As Amended on Grant of Rehearing
in Part Dec. 12, 1990.

---

Joy A. Kruse, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Robert H. Harper filed a pro se supplemental brief.

Thomas J. Tourish, Jr., Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., at the time the brief was filed, and Linda Turner Hamilton, Asst. U.S. Atty., were on the brief, for appellee.

Before ROGERS, Chief Judge, and NEWMAN and BELSON, Associate Judges.

BELSON, Associate Judge:

Appellant was charged with various offenses arising out of a rape and burglary of Ms. R.D. on April 7, 1985, and a burglary and assault of Ms. P.J. on July 26, 1985.[1]

---

1. Specifically, the indictment charged appellant in connection with the R.D. incident with two counts of first-degree burglary while armed, D.C.Code § 22–1801 (1989 Repl.) and D.C.Code

After a joint trial on all eleven counts arising from the incidents, the jury convicted appellant on all but one count.[2] Appellant seeks reversal on the ground that the trial court erred in denying his motion to sever the counts arising from the two incidents. We agree with appellant that it was reversible error to permit the jury to consider evidence of the April 7, 1985, incident in determining the issue of intent in connection with the July 26, 1985, incident, but are satisfied that the jury's consideration of the events of July 26, 1985, in connection with the issue of the identity of the perpetrator of the April 7, 1985, offenses did not give rise to reversible error.

I.

Shortly after midnight on April 7, 1985, a man entered the home of Ms. R.D. on Minnesota Ave., N.E., through a second floor window. He wore a stocking mask and had a long knife, and forced the fifty-six-year-old Ms. R.D. to take off her clothes and then, at knife point, instructed her to lead him through various rooms of her residence. He then forced her back to her bedroom where he compelled her to engage in intercourse and sodomy. The man also stole some jewelry and money before he departed. Ms. R.D. testified that she had met appellant on the preceding morning when appellant walked by her residence as she and a friend, Ms. R.T., were conducting a yard sale and distributing religious literature to passersby. Appellant stopped and talked with the two women for ten or fifteen minutes. Appellant returned again to Ms. R.D.'s residence at about 7:15 p.m. of the evening preceding the crimes. He spoke with the women about religion for a half an hour, first outside, and then in the house. On leaving, he took some of the literature, and left with Ms. R.D. his name, address, and telephone number.

Ms. R.D. testified that she told the police that she believed the perpetrator was appellant based primarily on the fact that she had noticed that both appellant and the intruder had a sniffle and the same bad diction, and were of the same build, height, and size. She testified she had paid particular attention to his voice, because his mask kept her from seeing his face, and later she selected his voice from among those of several men who uttered certain phrases R.D. specified at a "voice line up." A copy of that "line-up" was played to the jury at trial. Ms. R.D. stated at first that appellant's voice "really stood out" but that another voice also sounded like her assailant's voice. After hearing the voices again, she was sure that appellant's voice was the one. She was impeached with her statement to a detective that she did not think that she could identify the intruder visually and that she was not "sure" it was appellant.

Ms. R.D. described the intruder as a black male, twenty-five to thirty-five years old, and slim, about 5'11" and 135 pounds, and wearing blue pants. She also testified that just before he left through her back door he dropped his cigarettes on the floor, and she noticed that their brand was "Kools." The government introduced evidence that appellant smoked Kools cigarettes and that, consistent with the intruder, appellant's blood type was AB.

On July 26, 1985, fourteen-year-old Ms. P.J. heard someone enter her home on Ely Place, S.E., around 11:50 p.m. She and a seven-year-old friend were watching television when they heard a noise, and then saw a bedroom doorknob shaking. The girls armed themselves with a knife and a

---

§ 22–3202 (1989 Repl.), one count of rape while armed, D.C.Code § 22–2801 (1989 Repl.) and D.C.Code § 22–3202, two counts of sodomy, D.C.Code § 22–3502 (1989 Repl.), and one count each of armed robbery, D.C.Code § 22–2901 (1989 Repl.) and D.C.Code § 22–3202, and carrying a dangerous weapon, D.C.Code § 22–3204 (1989 Repl.). In connection with the P.J. incident, appellant was charged with two counts of first-degree burglary while armed, D.C.Code § 22–1801 and D.C.Code § 22–3202, assault with intent to commit rape while armed, D.C.Code § 22–502 (1989 Repl.) and D.C.Code § 22–3202, and carrying a dangerous weapon, D.C.Code § 22–3204.

**2.** Appellant was acquitted of the assault with intent to rape while armed charge, but was found guilty of the lesser-included offense of assault with a dangerous weapon, in connection with the P.J. incident of July 26, 1985.

pot from the kitchen, and pushed open the bedroom door. A man emerged from the bedroom wearing a stocking mask and holding a large knife. He looked at the girls while holding his knife upwards. He was wearing faded blue jeans, a gray cut-off sweatshirt, and white tennis shoes. The two girls screamed and threw the knife and the pot at the man. He then fled through the open bedroom window. Ms. P.J. described him as "a black male, late twenties, five nine in height, thin build, brown complexion, close cut hair, and ... a beard." Ms. P.J. recognized the intruder as appellant, whom she knew from the neighborhood, and identified him for the police by pointing out his residence in the same block of Ely Place in which Ms. P.J. resided.

Appellant presented a defense of alibi and misidentification. Appellant's wife testified that on April 6, 1985, when her husband returned during the day from running some errands, he showed her a religious pamphlet with a telephone number and two names, those of Ms. R.D. and Ms. R.T. According to Mrs. Harper, appellant went out again but returned around 8:30 p.m. and did not leave the house again that night. She and her husband watched television, specifically watching for a lottery number. She went upstairs around midnight and continued to watch television in the bedroom, and appellant followed her shortly thereafter. She testified that appellant was wearing a white T-shirt, blue jeans, and tennis shoes that night.

Mrs. Harper also testified regarding July 26, 1985. She stayed home from work that day because she was sick. Her husband returned from his work around 7:30 p.m. He was wearing a gray sweat suit and he changed into blue jeans. He left the house again between 8:30 and 9:00 p.m. and returned around 11:30 p.m. with a man named Cecil. Mr. Harper and Cecil remained for about twenty to twenty-five minutes. At that time, however, he left the house again. (Ms. P.J. put the time of the burglary of her residence at about 11:50 p.m.) Appellant returned around 1:00 to 1:30 a.m., at which time Mrs. Harper informed him that Detective Fox had stopped by and wanted Mr. Harper to telephone him. Appellant did so.

## II.

Over a month before trial, the United States moved to admit in its case in chief evidence of a rape committed on May 22, 1976, of which defendant had been convicted. According to the proffers in the government's motion, that crime bore several similarities to the rape of Ms. R.D. Appellant had gained entry to the victim's apartment through a bedroom window; he then forced the victim to walk through her apartment, checking each room, and remaining behind her throughout the walk. He then returned her to her bedroom where he raped her and, as in the R.D. case, made efforts to keep her from seeing him. After the rape, he went through her pocketbook, as the intruder had done in the R.D. case. He then had the victim go with him to the door of her apartment, and open it to allow him to escape, which was also similar to the rapist's conduct of the R.D. rape. The government sought the admission of the evidence both on the issue of identity and the issue of intent.

About two weeks before trial, the defense made a motion to sever the counts which related to the April rape from the counts which related to the July assault with intent to commit rape. Later, the defense filed its opposition to the government's motion to admit evidence of the rape appellant committed in 1976.

After a hearing, the trial judge denied both the government's motion to admit evidence of appellant's 1976 burglary and rape conviction and appellant's motion to sever the April and the July offenses. Pointing out that the 1976 incident differed from both the April and the July 1985 offenses in that the perpetrator did not wear a stocking mask and was not armed with a weapon, the trial court concluded that the use of the 1976 incident would be unduly prejudicial, particularly because appellant had been convicted of that rape. The court concluded on the other hand that "there is ample reason for identification

[and] for intent to keep [the April and the July offenses] together." The judge noticed striking similarities, including proximity in time and place, same mode of entry, stocking mask, and use of a long knife.

### III.

■ We may reverse the denial of a severance motion only for abuse of discretion. *See Brooks v. United States,* 448 A.2d 253, 257 (D.C.1982). We have frequently observed, however, that where offenses are of a similar character, there is a substantial risk of prejudice if they are joined for trial. As we stated in *Evans v. United States,* 392 A.2d 1015 (D.C.1978):

> Our cases therefore require that when joinder of offenses is based on the fact that the crimes are of a "similar character," a motion to sever should be granted unless (1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, or (2) the evidence of each of the joined crimes would be admissible at the separate trial of the others.

*Id.* at 1020 (quoting *Bridges v. United States,* 381 A.2d 1073, 1075 (D.C.1977), *cert. denied,* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978)).

■ In *Tinsley v. United States,* 368 A.2d 531 (D.C.1976), we observed:

> The appropriateness of joinder in evidence-of-other-crimes cases must be determined by balancing inevitable prejudice to the defendant caused by the joinder against the legitimate probative force of the evidence and expedition and judicial administration. *Drew v. United States,* 118 U.S. App. D.C. 11, 331 F.2d 85 (1964).

*Tinsley, supra,* at 533. In addition, even when the other crimes evidence fits within one of the *Drew* exceptions, the trial court

must still make a separate determination that its probative value outweighs its inherently prejudicial effect upon the defendant before admitting the evidence. *Landrum v. United States,* 559 A.2d 1323, 1326 (D.C. 1989); *Thompson v. United States,* 546 A.2d 414, 420 (D.C.1988); *Graves v. United States,* 515 A.2d 1136, 1139 (D.C.1986).[3]

The trial judge considered the matter of mutual admissibility on three occasions; first, when he denied the motion for severance; next, when he denied the defendant's motion for judgment of acquittal at the end of the government's case in chief; and finally, inferentially at least, when he instructed the jury. With respect to whether the evidence of the offenses against R.D. was admissible in the trial of the later offenses against P.J., the trial court made no individualized finding when it denied the motion to sever, but spoke generally of identification and intent as bases for mutual admissibility. In denying appellant's motion for judgment of acquittal, in which the appellant pressed the argument that there was inadequate evidence of intent to rape or steal in the July incident, the trial court stated that one of the reasons he let the cases "stay together was to show intent, motive, also for identification."[4] In discussing instructions, the trial court clarified that he had denied the motion for severance so that the jury might consider the evidence of the April 7 incident involving R.D. in determining the intent with which the person entered the house of P.J. on July 26 or 27, and that the jury could consider the July 26 or 27 incident only for the purpose of identification of the person who went into the R.D. residence on April 7. The trial court instructed the jury accordingly.

■ As we must assume the jury followed the court's instructions, we will evaluate admissibility of the R.D. incident in

---

3. The necessity of conducting a careful weighing of the probative value versus prejudicial effect merits special emphasis in this case, as this court has held that the danger of undue prejudice is particularly substantial in cases involving rape. *See Settles v. United States,* 522 A.2d 348, 355 (D.C.1987); *Bridges, supra,* 381 A.2d at 1078.

4. This was the trial court's only mention of motive and in light of the rest of the record, it appears fair to assume that this was not a basis on which the trial court relied in determining that evidence of the April incident was admissible in the trial of the July incident.

the trial of the later P.J. matter by determining whether the intent exception applies. As we explained in both *Thompson, supra,* 546 A.2d at 420, and *Graves v. United States, supra,* 515 A.2d at 1140, the intent exception has the capacity to emasculate the other crimes rule because it is often impossible to distinguish intent from predisposition, and intent is an element of virtually every crime. *See also Landrum, supra,* 559 A.2d at 1326; *Willcher v. United States,* 408 A.2d 67, 76 (D.C.1979). It is, of course, a principle of long standing in our law that evidence of the previous commission of a particular crime is inadmissible to prove predisposition to commit a certain type of crime, from which the jury might infer that the defendant committed the crime charged. *Drew v. United States,* 118 U.S. App. D.C. 11, 15, 331 F.2d 85, 89 (1964). *See also Thompson, supra,* 546 A.2d at 421–22 (illustration of the appropriate analysis of other crimes evidence through a comparison of *Ross v. State,* 276 Md. 664, 350 A.2d 680 (1976) with *United States v. Payne,* 256 U.S. App. D.C. 358, 805 F.2d 1062 (1986)).

■ Applying our precedents to the instant case, it becomes clear that the evidence of the April incident was not admissible on the issue of the perpetrator's intent in the July incident. The government made explicit its theory of the relevancy of the R.D. incident to the perpetrator's intent in the later P.J. incident in closing argument. The government argued to the jury,

> [a]nd you say where is the evidence of what he intended to do.... But what about to steal: Here comes instance number two, ladies and gentlemen, where you can look at where he raped Mrs. [R.D.], to draw the inference of what he was going to do in 4023. Now in Mrs. [R.D.'s] rape he came in the same way and he raped her, and then he stole property from her person. *Well, ladies and gentlemen, if he entered the same way at 4023, you can conclude beyond a reasonable doubt that given the chance*

> *he would have done the same thing inside there.* [Emphasis added.]

In other words, the prosecutor argued to the jury that, because the defendant did something in the past, that is what he intended to do this time. Essentially, what this is showing is predisposition rather than intent. Under *Drew,* as explained by *Graves* and *Thompson,* this is a misuse of the R.D. evidence in the trial of the later P.J. incident.

Having concluded that it was error to admit evidence of the April incident in the trial of the counts arising out of the July P.J. incident, we must go on to determine whether the error requires reversal or whether it may be deemed harmless error. We conclude that the error was not harmless. Although the evidence of appellant's involvement in the July incident was quite strong in several respects, particularly identification, the fact that the jury was made aware of the previous R.D. offense could well have had a strong impact on the jury's consideration of the burglary charges arising out of the July incident. Applying *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), to the burglary findings, we find it impossible to say with fair assurance after a careful review of the entire record that the judgment was not substantially swayed as a result of the admission of the evidence concerning R.D. *See Thompson, supra,* 546 A.2d at 428. We are satisfied, on the other hand, that we should sustain the jury's finding of guilt of carrying a dangerous weapon, as well as the convictions of unlawful entry as a lesser-included offense of burglary, and assault with a dangerous weapon as a lesser-included offense of assault with intent to commit rape while armed, because it is reasonable to conclude that the erroneously admitted evidence had little if any impact on the jury's consideration of those matters. This conclusion is buttressed by P.J.'s unequivocal identification of appellant as the person who entered her house and brandished a knife.[5]

---

**5.** In view of our recent holding in (*Melvin*) *Thomas v. United States,* 557 A.2d 599 (D.C.

1989) (en banc), based on *Lockhart v. Nelson,* 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265

■ Our holding that the evidence of the April offenses was impermissibly used to establish the intent with which appellant entered the residence of P.J. in July does not require a reciprocal conclusion that evidence of the July incident was impermissibly used to prove the identity of appellant as the perpetrator of the April offenses against R.D. As we have made clear in discussing the closely related issue of harmlessness in an instance of prejudicial joinder, "there will occasionally be instances in which offense B may be inadmissible in a trial for offense A, but offense A may be admissible in a trial for offense B." *Settles v. United States, supra,* 522 A.2d at 354. Accordingly, we address the argument of appellant that the trial court abused its discretion when it denied appellant's motion to sever and went on to instruct the jury that it could consider whether evidence of the July offenses was probative of the identity of the perpetrator of the April offenses.

■ The standard for the admissibility of other crimes evidence under the identity exception is set forth in *Easton v. United States,* 533 A.2d 904 (D.C.1987). In order for other crimes evidence to be admissible under the identity exception, the other crimes evidence must create " 'a reasonable probability that the same person committed both crimes due to the concurrence of unusual and distinctive facts....' " *Id.* at 907 (quoting *Drew, supra,* 118 U.S. App. D.C. at 16, 331 F.2d at 90). In *Bridges, supra,* 381 A.2d at 1075, this court held that the crimes must be "so nearly identical in method that it is likely that the present offense has been committed by [the same person]." As explained in *Easton,* this test does not require that a single characteristic itself be so unique as to lead to the conclusion that both were committed by the same person. Rather, the question is whether under the totality of factual circumstances the crimes are so nearly identical in method that there is a logical basis to assume that

the same person committed both crimes. *See Easton, supra,* 533 A.2d at 907–08.

As we have recognized, rulings in this area tend to be highly specific to the facts of each particular set of cases, *see Easton, supra,* 533 A.2d at 907, and therefore we will identify the particular aspects of the two offenses which suggest the probability that they were committed by the same individual, and then list those facts which suggest the contrary.

In both instances, the assailant gained entry to a private residence around midnight during a weekend by climbing through a bedroom window. The incidents took place in the same neighborhood, about six to eight blocks apart. The victims in each instance described the perpetrator as being a slim black male of about the same height (5'9" to 5'11" in the April incident and 5'9" in the July incident), and the same age (25 to 35 years of age in the April incident, and late twenties in the July incident).

Strikingly, in both instances, the intruder climbed in through a bedroom window while armed with a large knife with a blade described by both R.D. and P.J. as being about ten to twelve inches in length. In both instances, the intruder wore a stocking mask, a similarity which may be related to the fact that appellant was known to the victims in each case at least by sight, in the April incident because of his two visits to R.D.'s premises earlier on the preceding day and in the July incident because of the victim's familiarity with appellant as one who lived in the same block.

Turning to dissimilarities, the April entry into the R.D. residence was made through a second story bedroom window, whereas the bedroom involved in the July incident was on the first floor, and the victim in the April incident was a fifty-six-year-old woman, whereas the July victim was a fourteen-year-old girl (and possibly an even younger girl, as well). The intruder in the April incident went through with his plan to rape

(1988), even if we assume *arguendo* that without the evidence of the R.D. rape and burglary there was insufficient evidence to support appellant's conviction of first-degree burglary with intent to

rape or with intent to steal, a retrial on those charges is not barred by the Double Jeopardy Clause.

and steal, whereas the intruder in the July incident fled when confronted by two young girls who screamed and threw a knife and a pot at him. The incidents were not particularly close in time, there being a lapse of three and a half months between the occurrences. The bedroom into which the intruder admitted himself in the April case was being used as a storage room instead of as a sleeping room at the time.

Although these recitations of similarities and dissimilarities make it clear that the similarities are heavily in the preponderance, Harper argues that many of the similarities are commonplace in nature. For example, he argues that a knife is not an unusual weapon and that the length of a blade of ten to twelve inches is not particularly distinctive. It appears to us, to the contrary, that it is unusual, and very likely quite difficult, to clamber through a bedroom window while carrying a butcher knife with a blade almost a foot in length. And although the use of a stocking mask is not unheard of, especially in robberies, we cannot say that it fails to lend some degree of shared distinctiveness to the perpetration of the two offenses. And while the appellant would discount the numerous other similarities listed above because they are not unusual, we are impressed that so many circumstances are common to both the April and the July incidents. We have in the past quoted with approval the observation of Dean Wigmore that

> The process of constructing an inference of Identity ... consists usually in adding together a number of circumstances, each of which by itself might be a feature of many objects, but all of which together make it more probable that they coexist in a single object only. Each additional circumstance reduces the chances of there being more than one object so associated [2 WIGMORE ON EVIDENCE § 411 at 385–86 (3d ed. 1940)].

*Bridges, supra,* 381 A.2d at 1078. In *Bridges,* we upheld the joint trial of four offenses of rape committed within a six-month period in the same general area of Southeast Washington, D.C., three of them within a three block area. Making due

allowance for the fact that the July offenses were aborted, we view the similarities in the *Bridges* offenses as being certainly no greater than those between the offenses involved here, and probably not as great.

Appellant would put much reliance on our opinion in *Easton v. United States, supra,* but we point out that the dissimilarities between the two offenses involved there were far more striking than those present here. For example, two persons perpetrated the robbery of the taxi driver in the case under consideration in *Easton,* whereas in the earlier incident which was brought to the jurors' attention, a single person had committed the crime. In the previous incident which had occurred over two years earlier, the perpetrator had put a sharp object to the victim's throat and told him to give it up, but then had run away after taking a few dollar bills and some change from the taxi driver's pocket. In the case on trial in *Easton,* to the contrary, the two perpetrators seemed not to believe that the driver was carrying only a few dollars, and proceeded to ransack the cab and terrorize and threaten the driver for a considerable period of time before releasing him. Thus, our holding in *Easton* that the evidence of the previous incident was improperly admitted there is of no assistance to appellant on this issue.

In *Bridges, supra,* 381 A.2d at 1078, we recognized that the admissibility of such evidence is committed to the sound discretion of the trial court, and observed that although we could not say that we would have reached the same conclusion had we been in the position of the trial court, we held that the trial court did not abuse its discretion in denying appellant's motion to sever. Without stating any conclusion in this case as to whether we would or would not have admitted the evidence or granted the severance, we are satisfied that upon consideration of the totality of the factual circumstances, the two offenses were so similar that the trial judge in the exercise of sound discretion could permit the jury to consider the July incident on the issue of

the identity of the perpetrator of the April incident.

In view of the foregoing, appellant's conviction of the counts arising in the April incident involving R.D. are affirmed, and his conviction of the burglary counts arising from the July incident involving P.J. are reversed and remanded to the trial court,[6] but his convictions of carrying a dangerous weapon, unlawful entry as a lesser-included offense of burglary, and assault with a dangerous weapon as a lesser-included offense of assault with intent to commit rape while armed, arising out of the July incident are affirmed.

*Affirmed in part, and reversed and remanded in part.*

---

6. Because the issues of admissibility arise in the context of a denial of severance rather than admission of particular evidence, and our conclusion is that there was not mutual admissibility but only admissibility in one direction, on the *Drew* exceptions employed, it would be inaccurate to say that the trial judge did not abuse his discretion in denying severance. Either the court severed for both or it severed for neither. What we engage in is, in essence, a harmless error analysis similar to that performed by this court in *Settles, supra,* in the context of prejudicial joinder.